IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| YCB INTERNATIONAL, INC., | ) |
| | ) |
| Plaintiff/Counter-Defendant, | ) |
| | ) |
| v. | ) |
| | ) |
| UCF TRADING COMPANY LIMITED, | )      No. 09 C 7221 |
| | ) |
| Defendant/Counter-Plaintiff. | ) |
| _____ | ) |
| | ) |
| UCF TRADING COMPANY LIMITED, | ) |
| | ) |
| Third-Party Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| YANTAI CMC BEARING CO., LTD., | ) |
| | ) |
| Third-Party Defendant. | ) |

MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, Chief Judge:

Plaintiff YCB International, Inc. ("YCB") alleges that defendant UCF Trading Company

Limited ("UCF") failed to pay for $1,181,352.08 worth of bearings that UCF ordered and received

from YCB. (Dkt. No. 70.) YCB filed a complaint seeking payment of that amount on three bases:

the Uniform Commercial Code ("UCC") (Count I); common law breach of contract (Count II); and

wrongful rejection (Count III). In response, UCF filed its answer, counterclaim, and third-party

complaint, alleging that YCB and its parent company, Yantai CMC Bearing Co, Ltd. ("CMC") are

liable to UCF on eight bases: breach of contract (Count I); breach of express warranty (Count II);

breach of the implied warranty of merchantability (Count III); breach of the implied warranty of

fitness for a particular purpose (Count IV); unjust enrichment (Count V); common law fraud (Count

VI); a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (Count VII);

and civil conspiracy (Count VIII). (Dkt. No. 33.) Currently pending before the court is YCB's

motion for summary judgment on Count I, its UCC claim, against UCF. (Dkt. No. 257.) Also

pending before the court are motions by YCB (Dkt. No. 252) and CMC (Dkt. No. 245) seeking

summary judgment on all eight counts of UCF's claims against them. For the reasons explained

below, YCB's motion for summary judgment on its UCC claim against UCF (Dkt. No. 257) is

granted. The motions by YCB (Dkt. No. 252) and CMC (Dkt. No. 245) seeking summary judgment

on UCF's claims against them are granted as to UCF's claims in Counts I, II, III, IV, and VII, and

denied as to UCF's claims in counts V, VI, and VIII, for the reasons explained below.

BACKGROUND

UCF is a corporation of the Bahamas that purchases bearings on the open market and resells

them to its customers, who use the bearings in various manufacturing processes. (Dkt. No. 263[1] ¶¶ 1-

1A.) CMC is a manufacturer of bearings located in Yantai, China. (Dkt. No. 273 ¶ 1.) YCB is an

Illinois corporation and a wholly-owned subsidiary of CMC that sells CMC's bearings in the United

States, but does not manufacture bearings itself. (Dkt. No. 263 ¶ 1A; Dkt. No. 273 ¶¶ 2-3.)

When UCF's customers place purchase orders for bearings with UCF, UCF in turn places

an order for the bearings with a bearing supplier like YCB. (Dkt. No. 273 ¶ 4.) In 2008, UCF sent

---

[1] Because this order addresses multiple summary judgment motions with multiple Local Rule 56.1 statements and responses from each party, the court will not attempt to give each Local Rule 56.1 statement or response a distinct label. Instead, the court will refer to each statement by its docket number.

YCB thirteen separate purchase orders on behalf of various customers for bearings with a total purchase price of $1,181,352.08. (Dkt. No. 263 ¶ 2.) The purchase orders at issue were placed by UCF with YCB between April 4 and June 5, 2008, and they required delivery on dates ranging from June 1 to September 15, 2008. (Dkt. No. 258, Ex. A, Ex. 1.) Each of the purchase orders included on the reverse side a list of "Terms, Provisions, and Conditions." (Dkt. No. 273 ¶ 7.) The parties agree that all of the bearings were delivered to UCF or directly to its customers, and that to this day UCF has not paid for any of the bearings. (Dkt. No. 263 ¶¶ 2, 6.)

Robert Gagnon, the president of UCF, met with Mark Liu of YCB and Junbin Tao of CMC sometime in April of 2009 to discuss payment for the bearings. (Dkt. No. 263 ¶ 7.) According to Liu, Gagnon admitted at the meeting that UCF owed YCB payment for the bearings, but said that it could not pay because of a lack of funds. (Dkt. No. 258, Ex. A. ("Liu Decl.") ¶¶ 8-9.) By contrast, Gagnon testified that at the meeting he confronted Liu and Tao with the accusation that the bearings YCB delivered in response to the purchase orders had been manufactured by Taizhou Ruili Bearing Company ("Ruili"), and not by CMC as UCF had expected. (Dkt. No. 268, Ex. G ("Gagnon Dep.") 128:22-129:9.) According to Gagnon, Liu and Tao responded by stating that "one hundred percent" CMC made the bearings. (*Id.*) Gagnon did not recall if he told Liu and Tao that UCF was not going to pay, but he thought they understood from the exchange that UCF was not going to pay because Ruili had manufactured the bearings. Tao testified that they did not discuss who manufactured the bearings at the April 2009 meeting. (Dkt. No. 268, Ex. F ("Tao Dep.") 44:10-14.)

The manufacturer of the bearings was significant to UCF because many of its customers have strict quality control procedures, and refuse to accept bearings from a manufacturer without first testing the bearings that manufacturer produces to ensure that they are of the appropriate quality.

(Dkt. No. 273 ¶ 5.) CMC had submitted sample bearings to UCF's customers and had been approved as a supplier (*Id.* ¶ 6), but there is no evidence in the record as to whether Ruili's bearings were approved.

YCB and CMC admit that, in fact, some of the bearings that YCB sent to fill UCF's orders were manufactured by Ruili. (Dkt. No. 273 ¶¶ 20, 22.) CMC repackaged the bearings that it received from Ruili and shipped them to UCF and its customers in CMC packaging materials with CMC packing slips, including an invoice from YCB stating that it is the "Sales Office of Yantai CMC Bearing Company." (*Id.* ¶ 22.) Moreover, YCB and CMC did not tell UCF that any of the bearings had been made by Ruili. (*Id.* ¶ 20.) Robert Gagnon had traveled periodically to visit CMC's factories beginning in about 2001. (*Id.* ¶ 14; *see also* Tao Dep. 32:21-33:2.) Gagnon stated that the visits occurred about three times each year. (Dkt. No. 268, Ex. C ¶ 10.) Gagnon testified that during each of those visits, Tao told him that CMC manufactured all of its own bearings, although Tao denies ever making any such comment.[2] (Dkt. No. 273 ¶ 14.)

On April 27, 2009, following the meeting with Liu and Tao, Gagnon sent a letter on UCF letterhead to Liu at the YCB headquarters in Bolingbrook, Illinois. (Dkt. No. 263 ¶ 9.) The letter stated: "Further to today's meeting at UCF America Pennsauken New Jersey, please find listed the $1,181,352.08 invoices outstanding." After listing the invoices, the letter continued:

Beginning July 15, 2009, we will make monthly payments in the amount of $100,000.00, and continue until the total invoices outstanding are paid[.]

In the event that our business recovers sooner than anticipated, we will increase the

---

[2] CMC and YCB contend that Gagnon's testimony about Tao's statement is inadmissable hearsay because Tao spoke to Gagnon through a translator. The court finds that the testimony is admissible and excluded from the hearsay rule under Fed. R. Evid. 801(d)(2)(C). The fact that Tao's statement was through a translator goes to its weight, not to its admissibility.

amount of our monthly payment[.]

(Dkt. No. 70, Ex. A.)

Gagnon testified that when he wrote the letter, UCF had no intention of paying the invoices. (Dkt. No. 263 ¶ 11.) Instead, Gagnon explained that Liu told him that Tao would lose his job if he did not return to China with a letter indicating that he had asked for payment of the invoices. (*Id.*) Gagnon stated that he decided to write the letter to CMC to prevent Tao from losing his job before he could qualify to collect his pension the following year. (*Id.*)

UCF failed to make any payments to YCB on the outstanding invoices, and YCB filed suit in Illinois state court on October 5, 2009, to collect the outstanding payments. (Dkt. No. 1, Ex. A.) Following removal to federal court, but before answering the complaint, UCF contested the court's personal jurisdiction over it. (Dkt. No. 11.) In support of UCF's motion to dismiss for lack of jurisdiction, Gagnon submitted a declaration stating that "in or around June, 2009" UCF discovered that YCB had sent it bearings that had not been manufactured by CMC, and that the "counterfeit bearings" were the cause of the dispute between the parties. (Dkt. No. 12, Ex. 1 ¶ 24.) UCF filed its counterclaims against YCB, alleging that YCB had provided bearings that were not manufactured by CMC, on August 6, 2010. (Dkt. No. 33.)

## LEGAL STANDARD

A grant of summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the court of the basis for its motion and identifying the evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "There is no genuine issue of material fact when

no reasonable jury could find in favor of the nonmoving party." *Brewer v. Bd. of Trs. of the Univ. of Ill.*, 479 F.3d 908, 915 (7th Cir. 2007). When ruling on a motion for summary judgment, the court must consider the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in the nonmoving party's favor. *Woodruff v. Mason*, 542 F.3d 545, 550 (7th Cir. 2008). The court does not make credibility determinations or weigh conflicting evidence. *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010).

<u>ANALYSIS</u>

I.      YCB's Claim for Breach of Contract Under the UCC

The parties agree that UCF has not paid the $1,181,352.08 purchase price for the bearings that YCB delivered to UCF under the contracts formed by the thirteen purchase orders that UCF sent to YCB in 2008. Moreover, under the Uniform Commercial Code ("UCC") for the sale of goods, which Illinois has adopted, "[t]he buyer must pay at the contract rate for any goods accepted." 810 ILCS § 5/2-607(1). YCB contends that UCF accepted the bearings through Gagnon's April 27, 2009, letter, if not sooner, and that UCF is therefore liable to pay at the contract rate.

UCF first challenges YCB's argument by contending that the law of the Bahamas, rather than Illinois law, applies to the contracts. In support, it points to a single clause on the back of each of the thirteen purchase orders UCF sent to YCB in 2008 providing that "[t]his agreement shall be construed and considered as a contract made in the Commonwealth of the Bahamas." (Dkt. No. 268, Ex. C, Ex. B.) There are two problems with UCF's argument. First, the provision in the contracts to which UCF points is not plainly a choice of law provision. It does not state that the contract "shall be interpreted according to the laws of the Commonwealth of the Bahamas." *Cf. Bolger v. Nautica Int'l, Inc.*, 861 N.E.2d 666, 668 (Ill. App. Ct. 2007) (discussing a clause providing that "[t]his

-6-

agreement . . . shall be construed and interpreted according to the laws of the State of Florida"). Instead, it merely provides that the contract shall be construed as one made in the Bahamas. The location in which a contract is made is merely one factor to assess in the determination of which jurisdiction's laws to apply. *See Hinc v. Lime-O-Sol Co.*, 382 F.3d 716, 719 (7th Cir. 2004) ("[T]he contacts relevant to the choice-of-law decision include the place of contracting, negotiation, performance, location of the subject matter of the contract, and the domicile, residence, place of incorporation, and business of the parties." (citation, alterations, and quotation marks omitted)). The choice of law provision is thus inadequate to establish that Bahamian law applies.

Moreover, the court need not parse each of the factors of the choice of law test, because "before entangling itself in messy issues of conflict of laws a court ought to satisfy itself that there actually is a difference between the relevant laws of the different states." *Barron v. Ford Motor Co. of Canada Ltd.*, 965 F.2d 195, 197 (7th Cir. 1992). Here, UCF points out that the Bahamas have not adopted the UCC, and then explains that "[u]nder Bahamian law, UCF would be permitted to reject bearings described to have been manufactured by CMC, where only a portion of them were actually manufactured by CMC." (Dkt. No. 262, at 4.) The same rule prevails in Illinois under the UCC, however. *See* 810 ILCS 5/2-601 (explaining that the buyer may choose to accept non-conforming goods, reject non-conforming goods, or accept some and reject the rest). UCF identifies no other conflicts between Illinois and Bahamian law, and instead proceeds to argue the rest of the motion as if Illinois law applies. Accordingly, the court will apply Illinois law to this dispute. *Cf. Kochert v. Adagen Med. Int'l, Inc.*, 491 F.3d 674, 677 (7th Cir. 2007) ("Where the parties have not identified a conflict in state law, we will generally apply the law of the forum state.").

UCF next contends that it is not liable for the purchase price of the bearings because it never

accepted them, or, if it did accept them, it at least revoked its acceptance of them in a timely fashion after discovering that CMC had not manufactured the bearings. UCF's argument runs into multiple problems. First, a buyer may not reject (or revoke an acceptance of) goods unless they are non-conforming. *See* 810 ILCS 5/2-601 (buyer may reject "if the goods or the tender of delivery fail in any respect to conform to the contract"). UCF's theory is that the bearings failed to conform because CMC did not manufacture them. To succeed, therefore, UCF must establish that its contracts with YCB required CMC to manufacture the bearings.

Contractual interpretation is a matter of law that, in the absence of ambiguity, is particularly appropriate for summary judgment. *Cherry v. Auburn Gear, Inc.*, 441 F.3d 476, 481 (7th Cir. 2006). Here, UCF contends that its contracts with YCB required CMC to manufacture the bearings through the provision, found on the back of all of the purchase orders, that "Seller may not assign this order or the proceeds therefrom without the prior written consent of UCF." (Dkt. No. 268, Ex. C, Ex. B.) Under the UCC, that language likely prohibits the delegation of the Seller's duties under the contract, for "[u]nless the circumstances indicate the contrary a prohibition of assignment of 'the contract' is to be construed as barring only the delegation to the assignee of the assignor's performance." 810 ILCS /2-210(4). The next question, however, is whether the Seller's duties under the contract, which cannot be delegated, include manufacturing the goods that UCF ordered in its purchase orders. UCF points to no provision in the contract affirmatively requiring that the Seller manufacture the goods delivered. Instead, the Seller's duty appears to be merely to deliver the specified goods, and the contract nowhere specifies that the goods must be manufactured by CMC.

That interpretation is confirmed by the identity of the contracting parties. The term "Seller" is not defined in the contract, but the only party to which it could possibly refer is the party to which

the purchase orders are explicitly addressed: YCB.[3] Indeed, nothing in the purchase orders or the contractual terms on the reverse of the purchase orders even mentions CMC. Given that YCB does not manufacture bearings itself, it would be absurd to conclude that the contracts it formed with UCF forbid YCB to delegate the manufacture of the bearings to another entity. The anti-assignment provision of the contract thus does not forbid an entity other than YCB to manufacture the bearings.

UCF does not point to any other provision of the contract requiring CMC to manufacture the bearings.[4] Indeed, because UCF has not even pointed to a provision that is ambiguous and could be interpreted to require CMC to manufacture the bearings, and because the contract is a fully

---

[3] UCF argues repeatedly that YCB and CMC should be regarded as the same company, but it provides no evidence indicating that the court should pierce the corporate veil and disregard the corporate formalities. A subsidiary will only be treated as the same company as its parent corporation, "where a subsidiary is so organized and controlled, and its affairs so conducted by a parent, that observance of the fiction of separate identities would sanction a fraud or promote injustice under the circumstances." *In re Rehab. of Centaur Ins. Co.*, 632 N.E.2d 1015, 1017-18 (Ill. 1994). UCF contends that YCB anc CMC are identical because YCB is a wholly-owned subsidiary of CMC, YCB serves as CMC's importer in the United States, YCB sells only CMC products, and Liu testified that YCB and CMC are "the same company." (Dkt. No. 262, at 5.) No reasonable jury could conclude from those facts that CMC controls YCB to the extent that the existence of separate entities is a fiction. *Cf. Sumner Realty Co. v. Willcott*, 499 N.E.2d 554, 557 (Ill. App. Ct. 1986) ("The separate corporate entities of two corporations may not be disregarded merely because one owns the stock of the other or because the two share common officers or occupy the same office space. Rather, the party seeking to have the corporate entity disregarded must come forward with a substantial showing that one corporation is really a dummy or sham for another, and it must appear that observance of separate existence would, under the circumstances, sanction a fraud or promote injustice." (citations omitted)).

[4] Although UCF does not raise the issue to support its argument that the contract requires CMC to manufacture the bearings (Dkt. No. 262, at 5-7; Dkt. No. 264, at 6-8), the court notes that the contract includes a provision stating that "Seller expressly warrants to UCF and its customers and agents that all merchandise covered by this order . . . shall conform to the drawings, specification, descriptions or samples furnished or specified by UCF. . . . No materials may be substituted in lieu of those specified." (Dkt. No. 268, Ex. C, Ex. B.) UCF has not pointed to any evidence, however, showing that UCF specified to YCB that CMC must manufacture all of the bearings it ordered.

integrated writing,[5] the court need not examine extrinsic evidence. *See Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 878 (7th Cir. 2005).The contract thus does not require that CMC manufacture the bearings, and UCF's alleged rejection of the bearings because Ruili manufactured them is improper.

But even assuming that the contract required CMC to manufacture the bearings, UCF cannot prevail, for there is no genuine dispute that UCF accepted the goods. An acceptance occurs under the UCC when the buyer "after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their non-conformity." 810 ILCS 5/2-606(a). Here, the April 27, 2009, letter from Gagnon to Liu plainly signifies that UCF acknowledged its duty to pay for the bearings, an obligation that could attach only following acceptance of the goods. *See* 810 ILCS 5/2-607(1) ("The buyer must pay at the contract rate for any goods accepted.") The letter thus signifies UCF's acceptance of the bearings.[6]

UCF contends that it could not have accepted the goods under § 2-606(a) because it did not have a reasonable opportunity to inspect the goods. That argument is disingenuous, given that the undisputed testimony of Gagnon indicated that he and UCF knew, as of his meeting with Liu and Tao, that CMC had not manufactured all of the bearings. (Gagnon Dep. 123:4-10.) The adequacy of the time that UCF had to inspect the goods is thus irrelevant, for as of April 27, 2009, UCF had actual knowledge of the alleged defect, and yet communicated acceptance of the goods to YCB in

---

[5] The contract provides that "[t]his purchase order supersedes any and all prior oral or written dealings between UCF and Seller in respect to the matters herein contained." (Dkt. No. 268, Ex. C, Ex. B.)

[6] The parties' disagreements over whether Gagnon indicated to Liu and Tao at their April meeting that UCF did not plan to pay for the bearings, and over whether that communication constituted a rejection, are irrelevant, for, as the official commentary to the UCC indicates, a buyer "can obligate himself by a communication of acceptance despite a prior rejection." 810 ILCS 5/2-606 cmt.4.

the April 27 letter. UCF's argument that it did not accept the goods thus fails.

Nor can UCF contend that it later revoked its acceptance. Under the UCC, "[a]cceptance of goods by the buyer precludes rejection of the goods accepted and if made with knowledge of a non-conformity cannot be revoked because of it unless the acceptance was on the reasonable assumption that the non-conformity would be seasonably cured." 810 ILCS 5/2-607(2). There is no evidence here that UCF assumed that YCB would cure the alleged defect, so it could not revoke acceptance.

Finally, UCF's multiple counterclaims against YCB cannot preclude summary judgment, for "[i]n a summary judgment proceeding, a counterclaim is a separate action and will not defeat the original claim for the contract price." *Softa Group, Inc. v. Scarsdale Dev.*, 632 N.E.2d 13, 15-16 (Ill. App. Ct. 1993). The court therefore grants YCB summary judgment on its claim for breach of contract under the UCC. YCB is entitled to $1,181,352.08, plus interest at an annual rate of 5% from April 27, 2009, the date of acceptance when the contract price became due, through the date of the final judgment. *See Twenhafel v. State Auto Prop. & Cas. Ins. Co.*, 581 F.3d 625, 631 (7th Cir. 2009).

II.     UCF's Claims Against YCB and CMC

The court will now consider YCB's and CMC's motions for summary judgment on UCF's counterclaims and third-party claims.

A.      Breach of Contract and Express Warranty (Counts I & II)

As explained above, the contracts between YCB and UCF for the sale of bearings did not require YCB to supply bearings manufactured by CMC. That determination is legally fatal to UCF's claims for breach of contract.

On the express warranty claims, UCF points to the contracts' language providing that "Seller expressly warrants to UCF and its customers and agents that all merchandise covered by this order . . . shall conform to the drawings, specification, descriptions or samples furnished or specified by UCF. . . . No materials may be substituted in lieu of those specified." (Dkt. No. 268, Ex. C, Ex. B.) According to UCF, YCB breached that warranty by providing bearings that were "not in conformance with the samples CMC submitted to become an approved supplier." (Dkt. No. 264, at 9.) The warranty provides, however, that YCB must provide bearings conforming to the specifications and samples provided by UCF to YCB, not by CMC to UCF. There is no evidence that UCF ever specified to YCB that CMC must manufacture the bearings.

UCF might contend that it implicitly required that all bearings conform with the samples from CMC that its customers approved. There is no evidence, however, that UCF ever explained its customers' approval process to YCB, or specified to YCB that the identity of the manufacturer was a material part of the decision to approve the sample bearings. UCF's argument thus fails, along with its claims for breach of express warranty. YCB's and CMC's motions for summary judgment are granted on Counts I and II.

B.      Breach of Implied Warranty (Counts III & IV)

To succeed on its claim of breach of the implied warranty of merchantability (Count III), UCF must show that the bearings YCB provided were not "merchantable." 810 ILCS 5/2-314. To show the breach of an implied warranty of fitness for a particular purpose (Count IV), UCF must show that YCB at the time of contracting had reason to know a particular purpose for which UCF required the goods, that UCF relied on YCB's skill or judgment to select or furnish suitable goods to achieve that purpose, and that the goods were not suitable to meet that purpose. *See* 810 ILCS 5/2-

315.

YCB and CMC contend in their motions for summary judgment that UCF cannot point to any evidence showing that the bearings were not merchantable, or that YCB had reason to know of a particular purpose for which UCF needed the bearings. In its response, UCF presents no evidence or argument at all relating to its implied warranty claims. Accordingly, the court will consider UCF to have dropped its claims for breach of implied warranty. *See Palmer v. Marion Cnty.*, 327 F.3d 588, 597-98 (7th Cir. 2003) ("[B]ecause Palmer failed to delineate his negligence claim in his district court brief in opposition to summary judgment or in his brief to this Court, his negligence claim is deemed abandoned."); *Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 810 (7th Cir. 2001) (failure to raise issue in response to summary judgment before district court resulted in waiver); *Laborers' Int'l Union of N. Am. v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999) ("We have long refused to consider arguments that were not presented to the district court in response to summary judgment motions." (citations and quotation marks omitted)); *Robyns v. Reliance Std. Life Ins. Co.*, 130 F.3d 1231, 1237 (7th Cir. 1997) ("A party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered."). YCB's and CMC's motions for summary judgment on UCF's breach of implied warranty claims, Counts III and IV, are granted.

C.    Common Law Fraud (Count VI)

UCF next alleges that YCB and CMC are liable for common law fraud because of their misrepresentation that the bearings YCB sold to UCF were manufactured by CMC. To survive a motion for summary judgment on that count, UCF must present evidence on which a reasonable jury could find "'(1) a false statement of a material fact; (2) defendant's knowledge that the statement

was false; (3) defendant's intent that the statement induce plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement.'" *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 881-82 (7th Cir. 2005) (quoting *Capiccioni v. Brennan Naperville, Inc.*, 791 N.E.2d 553, 558 (Ill. App. Ct. 2003)). UCF's theory is that CMC misrepresented to UCF that CMC manufactured the bearings it shipped to UCF through Tao's comments to Gagnon during Gagnon's visits to CMC's factory. UCF asserts that YCB made the same misrepresentation because it shipped the Ruili-manufactured bearings to UCF in CMC packaging with CMC packing slips and an invoice from YCB stating that it is the "Sales Office of Yantai CMC Bearing Company."

YCB and CMC contend that, even assuming there were such misrepresentations, the misrepresentations are immaterial and UCF did not rely on them. At the time YCB delivered an order of bearings, YCB and CMC argue, UCF had already placed that order for bearings, so any later misrepresentation could not have influenced its decision to order those bearings from YCB. Moreover, YCB and CMC assert, any statement that future shipments would be manufactured by CMC was a future promise, and not a statement of fact amenable to a fraud claim. *See Desnick v. Am. Broad. Cos., Inc.,* 44 F.3d 1345, 1354 (7th Cir. 1995) ("[P]romissory fraud is actionable only if it either is particularly egregious or, what may amount to the same thing, it is embedded in a larger pattern of deceptions or enticements that reasonably induces reliance and against which the law ought to provide a remedy.").

The problem with that argument, however, is that UCF was a repeat player in its orders from YCB. Thus, a misrepresentation about the manufacturer of the bearings in an earlier shipment may have induced UCF to continue to order bearings from YCB in the future. The parties agree that

CMC began receiving bearings from Ruili as early as May 2007. (Dkt. No. 273 ¶ 15.) If Ruili bearings were included in shipments to UCF in 2007, Tao's statements to Gagnon after that date[7] that CMC manufactured all of its own bearings would be false and material to UCF's decision to continue ordering bearings from YCB in 2008. A reasonable jury could also interpret the CMC packing materials and YCB's invoices that accompanied YCB's delivery as statements by YCB that the enclosed bearings were manufactured by CMC. Such statements, again, would be false and material to UCF's ongoing purchasing decisions.

There is also evidence that UCF relied on those statements, because UCF cared about the identity of the manufacturer. UCF's customers wanted only bearings from an approved manufacturer (Dkt. No. 273 ¶ 5), so a reasonable jury could conclude that UCF would purchase only bearings made by an approved manufacturer. Tao's false statements and the CMC packaging thus could have induced UCF to continue to place orders for bearings with YCB in 2008, including the thirteen purchase orders at issue in this litigation, because it was under the false impression that CMC would manufacture the bearings. Accordingly, there is evidence that YCB's and CMC's statements that CMC manufactured the bearings were material, and that UCF relied upon them in its decision to continue ordering bearings from YCB.

YCB and CMC also assert that UCF cannot show that their misrepresentations proximately harmed UCF. In response, UCF asserts two theories of damages.[8] The first is that, as Gagnon

---

[7] Gagnon testified that Tao made such a statement each time Gagnon visited CMC's factory, an event that occurred three times a year each year after about 2001. (*See* Dkt. No. 273 ¶ 14; Dkt. No. 268, Ex. C ¶ 10.) At least some of the representations thus occurred after 2007.

[8] UCF does not contend that it was harmed because its customers received lower quality bearings from Ruili than they would have received from CMC, perhaps because, as CMC and YCB point out, no UCF customer complained to UCF that the bearings they received were of inferior

testified, UCF paid more for CMC bearings because it was under the false impression that they were of a higher quality than bearings from Ruili. UCF thus claims that it is entitled to the difference between the price it paid to CMC and the price of the bearings it could have purchased directly from Ruili. The court finds that theory unpersuasive, however, because, as mentioned above, UCF would not purchase unapproved bearings that its customers had not approved. (Dkt. No. 273 ¶ 5.) In the absence of the misrepresentation (that is, if YCB and CMC had told UCF that the bearings they provided were not manufactured by CMC), UCF would not have agreed to accept Ruili bearings at a lower price. Instead, it would have sought another approved supplier. The difference in price between CMC bearings and Ruili bearings cannot be the measure of damages.

Second, UCF points to the testimony of Gagnon that UCF lost three of its largest customers, constituting over 65%[9] of its business, because of the misrepresentations. (Dkt. No. 273 ¶ 31.) According to Gagnon, after learning of the fraud, "one thing [UCF] couldn't do is to continue to sell CMC bearings that were counterfeits, so we lost our customers. And all our three biggest customers we lost completely because we had no other supply and we just lost them." (Gagnon Dep. 140:3-7.) Although UCF does not extensively develop this argument, it appears to be suggesting that, in the absence of the misrepresentation, it would have obtained a different supplier whom it would not have had to abandon suddenly upon learning of its fraud. Consequently, its supply chain would not have been disrupted in a way that prevented it from finding a new supplier soon enough to avoid

---

quality, and there is no evidence that any injury or damage occurred from the customers' use of the allegedly lower quality bearings. (*See* Dkt. No. 266 ¶¶ 23, 27.)

[9] UCF's Rule 56.1 statement of additional facts states that UCF lost 75% of its business, but Gagnon's deposition testimony was that it lost 65% of its business. (Gagnon Dep. 140:8.)

losing customers.[10]

That theory may be difficult to establish at trial, for of course UCF had a duty to mitigate its damages by searching for a new supplier, *Clarkson v. Wright*, 483 N.E.2d 268, 270 (Ill. 1985), and there is no evidence in the record about why it could not find a new supplier soon enough to avoid losing customers. Nonetheless, at the summary judgment stage, viewing the facts in the light most favorable to UCF, the court determines that Gagnon's testimony is enough to allow a reasonable jury to determine that UCF was proximately harmed by CMC's and YCB's misrepresentations. Accordingly, CMC's and YCB's motions for summary judgment on UCF's fraud claim, Count VI, are denied.

###### D. Unjust Enrichment (Count V)

YCB and CMC also move for summary judgment on UCF's claim of unjust enrichment (Count V). The sole argument YCB and CMC present in support of their motion is that the unjust enrichment claim depends on the same facts underlying UCF's other claims, and that "if an unjust enrichment claim rests on the same improper conduct alleged in another claim, then the unjust enrichment claim will be tied to this related claim—and, of course, unjust enrichment will stand or fall with the related claim." *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 517 (7th Cir. 2011). Not all of UCF's other claims have fallen, however, as its misrepresentation claim will survive the summary judgment motions. Accordingly, the unjust enrichment claim, Count V, can survive as well. *See Martis v. Grinnell Mut. Reinsurance Co.*, 905 N.E.2d 920, 928 (Ill. App. Ct. 2009) (an unjust enrichment claim can be based on a "valid underlying fraud claim"). YCB's and CMC's motions

---

[10] That theory is consistent with the testimony of representatives of the three customers who left UCF, which was that the customers ceased ordering from UCF because UCF could not provide a sufficient quantity of bearings at a low enough price. (*See* Dkt. No. 266 ¶ 27.)

for summary judgment on Count V are denied.

E.      Consumer Fraud and Deceptive Practices Act (Count VII)

To succeed under the Consumer Fraud and Deceptive Practices Act, UCF must show, in addition to the elements of a fraud, that there is a nexus between the fraud and consumer-protection concerns, and that the alleged fraud occurred "primarily and substantially in Illinois." *See LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*, 809 F. Supp. 2d 857, 860 (N.D. Ill. 2011). Here, UCF is not itself a consumer. Nor is there evidence that consumers were injured, for, as mentioned above, no UCF customer complained that the bearings they received were of inferior quality, and there is no evidence that any injury or damage occurred from the customers' use of the allegedly lower quality bearings. (*See* Dkt. No. 266 ¶¶ 23, 27.) Moreover, there is no evidence in the record that UCF's customers were unable to obtain adequate bearings from other sources after UCF stopped supplying them or that their production was otherwise disrupted in a way that would harm consumers.

UCF presents the testimony of Gagnon and two representatives of UCF's customers stating that the Ruili bearings failed some "tests" that UCF's customers performed on them. (Dkt. No. 273 ¶ 27.) Neither Gagnon nor the representatives of the customers themselves performed the tests or have personal knowledge about them, however, so their testimony is inadmissable hearsay. (*Id.*) Moreover, even if the testimony were admissible, UCF presents no evidence about the nature of the tests, or about whether failing the tests indicates that the bearings are potentially dangerous to consumers who purchase products made with the bearings. Conclusory comments that Ruili bearings failed some unspecified "tests" are insufficient to allow a reasonable jury to conclude that the use of Ruili bearings could harm consumers. Accordingly, there is no nexus between YCB's and CMC's misrepresentations and consumer-protection concerns. YCB's and CMC's motions for summary

-18-

judgment on the Consumer Fraud and Deceptive Practices Act claims, Count VII, are granted.

      F.     Civil Conspiracy (Count VIII)

      Other than reciting the elements of civil conspiracy, the entirety of YCB's and CMC's argument that they are entitled to summary judgment on UCF's civil conspiracy claims is that "[t]here is no evidence of a tort, or that the alleged co-conspirators, Frank Ho, CMC or YCB, agreed to accomplish a tort." (Dkt. No. 246, at 13; Dkt. No. 254, at 13.) That argument is insufficient to meet CMC's and YCB's burden of "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325; *see also Carmichael v. Vill. of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010) ("The burden of defeating summary judgment did not shift to the plaintiffs on this issue simply because, without citation to relevant facts or authority pertaining to the strip search, the defendants sought summary judgment on all claims against all parties."); *Donnelly v. Chicago Park Dist.*, 417 F. Supp. 2d 992, 1006 (N.D. Ill. 2006) ("[T]he Park District's argument for summary judgment on plaintiff's FMLA claim is perfunctory, conclusory, and undeveloped, and need not be considered."); Jeffrey W. Stempel & Steven S. Gensler, *Moore's Federal Practice–Civil* § 56.40[1][b][iv] (rev. 2012) ("[B]ecause the rule explicitly requires a 'showing,' there must be at least enough evidentiary support for the assertion that the nonmovant lacks crucial evidence to demonstrate the movant's good faith. The nonmovant and the court should not face the burdens imposed by a summary judgment when the movant has no basis for its assertion."). CMC's and YCB's motions for summary judgment on UCF's civil conspiracy claims, Count VIII, fail.

III.     Fed. R. Civ. P. 54(b)

      Because YCB obtained summary judgment on its breach of contract claim against UCF for

the purchase price of the bearings, but not all claims are yet adjudicated, YCB requests that the court enter a final judgment on its claim for breach of contract under Fed. R. Civ. P. 54(b). That rule allows the court, within its discretion, to enter judgment on one or more claims when other claims in the action are still pending "only if the court expressly determines that there is no just reason for delay." The court is hesitant to exercise that discretion here, however, because of the difficulties that sometimes occur in collecting judgments from corporations connected to foreign entities. Accordingly, the court will not enter final judgment in favor of YCB at this time.

CONCLUSION

For the reasons stated above, YCB's motion for summary judgment on its breach of contract claim against UCF, Count I of YCB's complaint, (Dkt. No. 257) is granted. Counts II and III of YCB's complaint are moot. The motions by YCB (Dkt. No. 252) and CMC (Dkt. No. 245) seeking summary judgment on UCF's claims against them are granted in part and denied in part. YCB and CMC are awarded summary judgment in their favor on Count I, Count II, Count III, Count IV, and Count VII of UCF's counterclaim and third-party complaint, all of which are dismissed with prejudice. A status hearing is set for 11/27/12 at 9 am to set a date for trial on Count V, Count VI, and Count VIII of UCF's claims against YCB and CMC. The parties are encouraged to discuss settlement.

ENTER:

_James F. Holderman_

JAMES F. HOLDERMAN
Chief Judge, United States District Court

Date: November 13, 2012

-20-