**1**

1          UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF ILLINOIS
2               EASTERN DIVISION

3   YCB INTERNATIONAL, INC.,          )
                                      )
4                  Plaintiff,         )
                                      )
5        vs.                          )   No. 09 C 7221
                                      )
6   UCF TRADING COMPANY LIMITED,      )   Chicago, Illinois
                                      )   February 18, 2014
7                  Defendant.         )   2:00 o'clock p.m.

8                TRANSCRIPT OF PROCEEDINGS -
9                   Evidentiary Hearing
          BEFORE THE HONORABLE JAMES F. HOLDERMAN
10

11  APPEARANCES:

12  For the Plaintiff:      LAW OFFICES OF GREGORY J. BUECHE
                            BY:  MR. GREGORY J. BUECHE
13                          27475 Ferry Road
                            Warrenville, Illinois  60555
14                          (630) 717-2962

15  For the Defendant:      ATOM LAW GROUP
                            BY:  MR. OSCAR R. TREJO
16                          770 North LaSalle Street, Suite 700
                            Chicago, Illinois  60654
17                          (312) 943-8000

18                          COSENTINO LAW FIRM
                            BY:  MR. CHRISTIAN J. COSENTINO
19                          801 East Main Street
                            St. Charles, Illinois  60174
20                          (630) 377-9730

21

22
            COLLEEN M. CONWAY, CSR, RMR, CRR
23               Official Court Reporter
          219 South Dearborn Street, Room 2144-A
24             Chicago, Illinois  60604
                    (312) 435-5594
25          *colleen_conway@ilnd.uscourts.gov*

1      (Proceedings heard in open court:)
2              THE CLERK:  09 C 7221, YCB International versus UCF
3      Trading.
4              MR. BUECHE:  Good morning, Your Honor.
5              Gregory J. Bueche for YCB International.
6              THE COURT:  Good afternoon.
7              MR. TREJO:  Good morning, Your Honor.
8              Oscar Trejo on behalf of UCF Trading and UCF Company.
9              THE COURT:  Good afternoon.
10             MR. COSENTINO:  Good afternoon, Judge.
11             Chris Cosentino on behalf of UCF, accompanying Oscar
12     Trejo.
13             THE COURT:  All right.  Good afternoon.
14             Are we ready to proceed?
15             MR. BUECHE:  Yes, Your Honor.
16             And just on the procedure, I do have some questions I
17     would like to ask Mr. Gagnon.  I don't know if you'll be
18     allowing that, but --
19             THE COURT:  Is Mr. Gagnon here?
20             MR. BUECHE:  He is.
21             MR. COSENTINO:  He's present in open court, Your
22     Honor.
23             THE COURT:  All right.
24             MR. BUECHE:  I'm going to --
25             THE COURT:  You certainly may.

1      MR. BUECHE:  I'm going to confine myself to the issue

2   that's before the Court today, which is whether there's

3   documents that should have been turned over.  I'm going to --

4          THE COURT:  Okay.

5          MR. BUECHE:  -- try and stay away from -- running

6   away from myself into questioning about assets.  I'm just going

7   to stick to a couple of things about indications I've seen in

8   what's produced that more should be produced.

9          THE COURT:  All right.  Here's how we're going to

10   proceed.  I want brief opening remarks from both sides.  Then

11   YCB can call whatever witnesses it desires to prove its

12   position.

13          MR. BUECHE:  Thank you, Your Honor.

14          THE COURT:  All right.  Opening statement on behalf

15   of YCB.

16          OPENING STATEMENT ON BEHALF OF PLAINTIFF

17          MR. BUECHE:  Your Honor, this is a case where you're

18   very familiar with, but we sent a citation to discover assets

19   to UCF Trading, and among the things that we asked UCF Trading

20   was for transactions between it and UCF Company, which is a

21   company that has the same address, largely the same

22   shareholders, same business, same suppliers, same customers.

23          There have been indications that there have been

24   numerous transactions.  However, because what I feel is

25   happening is that there has been a decision at some point in

**Trejo - opening**                                    **4**

1   time to simply call the business UCF Company and not provide

2   documents on the grounds that the -- they have nothing to do

3   with UCF Trading assets, we have been stymied.  We get excuses

4   from UCF Trading about things missing; and then from UCF

5   Company, we get objections.

6          And I think that we can -- that I will establish that

7   there are a few things that are obviously missing.  I don't

8   want to go through everything that could possibly be missing

9   because that's for the citation, but there are some things that

10  strike me and I will show those to the Court on evidence.

11         Thank you.

12          OPENING STATEMENT ON BEHALF OF DEFENDANT

13         MR. TREJO:  Good afternoon, Your Honor.

14         With regards to UCF Trading and UCF Company, there

15  was a -- it is our contention that there is no real overlap

16  between the two companies.  UCF Company was formed on January

17  21st, 2011.  However, it did not acquire its own bank account

18  until, I believe, October 12th of 2012.

19         That said, beginning January of 2011, UCF Trading did

20  not hold itself out as operating.  It did not seek any sales.

21  It did not have any employees.  The company was effectively

22  shut down to the public.  Its skeleton still remained, but it

23  was not an active company.  However, in that --

24         THE COURT:  When you say "skeleton remained," what do

25  you mean?

**5**

1    MR. TREJO:  I mean, its bank account and its

2    invoicing were still being utilized by UCF Company but for

3    purposes of dealing with UCF Company suppliers and UCF Company

4    customers.

5    THE COURT:  So UCF Company basically took over the

6    documents of UCF Trading and used them for UCF Company's

7    business?

8    MR. TREJO:  Not necessarily the documents, Your

9    Honor, but the bank account.  And my client --

10   THE COURT:  How does one transact a bank account?

11   MR. TREJO:  The issue is that in the Bahamas, it is

12   very difficult --

13   THE COURT:  Well, don't you issue checks?

14   MR. TREJO:  Yes, Your Honor.

15   THE COURT:  Okay.  And don't you make deposits?

16   MR. TREJO:  Yes, Your Honor.

17   THE COURT:  Isn't that how you transact a bank

18   account unless you use electronic means?

19   MR. TREJO:  Correct, Your Honor.

20   THE COURT:  And using electronic means, you have a

21   mechanism by which the sender and receiver know who it is

22   they're dealing with.

23   MR. TREJO:  Correct, Your Honor.

24   THE COURT:  Okay.  And the person or the company they

25   were dealing with was UCF Company as of January 2011?

1          MR. TREJO:  Correct, Your Honor.

2          THE COURT:  Okay.

3          MR. TREJO:  And so in this case, it wasn't the ideal

4   situation, it wouldn't be the perfect way to do it if you were

5   going to advise someone how to do it, but keep in mind, Your

6   Honor, this is a company based out of the Bahamas.  UCF Trading

7   is not an American company.  UCF Company is not an American

8   company.  Mr. Gagnon is not an American citizen.  He's dealing

9   with Bahamian business practices and --

10          THE COURT:  Well, doesn't he have to comply with the

11   United States law when he transacts business in the United

12   States, even though he's not a citizen?

13          MR. TREJO:  To the extent that U.S. law is

14   applicable, that would be correct, Your Honor.

15          THE COURT:  Okay.

16          MR. TREJO:  But as far as for this particular

17   instance, I'm not sure what laws are relevant to what he was

18   doing.  The law that was relevant was that it's very difficult

19   to obtain a U.S. dollar bank account in the Bahamas, and, as a

20   result, there was some transactions that UCF Company was making

21   that were done with UCF Trading's old bank account.  And

22   because of this reason, there was no overlap in the two

23   companies as far as UCF Company and UCF Trading are concerned.

24          THE COURT:  All right.  You may call your first

25   witness.

**Gagnon - direct by Bueche**                                    **7**

1          MR. BUECHE:  I call Mr. Robert Gagnon.

2          THE COURT:  Step up here, sir.  Thank you.  Raise

3    your right hand.

4          (Witness duly sworn.)

5          THE COURT:  All right.  Please be seated.  That

6    microphone in front of you will amplify your voice.  You can

7    hold it close, sir.  Pull it down close to you so that it will

8    assist you.

9              ROBERT GAGNON, PLAINTIFF'S WITNESS, SWORN

10                         DIRECT EXAMINATION

11   BY MR. BUECHE:

12   **Q.**  Mr. Gagnon, what is your title with UCF Trading Company?

13   Or -- yeah, UCF Trading.  I'm sorry.

14   **A.**  President.

15   **Q.**  And your --

16          THE COURT:  Why don't we get the spelling of your

17   name and then we'll get into all the other details.

18          How do you -- would you state your name and spell

19   your last name, sir.

20          THE WITNESS:  Okay.  My name is Robert Gagnon, and

21   Gagnon is spelled G-a-g-n-o-n.

22   BY MR. BUECHE:

23   **Q.**  And where do you live, Mr. Gagnon?

24   **A.**  I live in Nassau, Bahamas.

25   **Q.**  Is that your current residence?

**Gagnon - direct by Bueche**                              **8**

1   **A.**  Yes, it is.

2   **Q.**  Okay.  Does it have a street address?

3   **A.**  Yes, it does.

4   **Q.**  May we have it for the record?

5   **A.**  It's Brace Ridge Road, No. 10.

6              THE COURT:  Brace Ridge Road, No. 10.  How do you

7   spell Brace?

8              THE WITNESS:  B-r-a-c-e.

9              THE COURT:  Thank you.

10  BY MR. BUECHE:

11  **Q.**  And what is your title with UCF Trading Company?

12  **A.**  President.

13  **Q.**  Are there any other officers of UCF Trading Company?

14  **A.**  Yes.

15  **Q.**  Were you the person who was tasked to collect documents

16  responsive to the citation to discover assets that was issued

17  to UCF Trading Company in this case?

18  **A.**  Personally, yes.

19  **Q.**  Are you also an officer of UCF Company?

20  **A.**  Yes.

21  **Q.**  And what's your title in that company?

22  **A.**  President.

23  **Q.**  Okay.  And following some remarks that counsel made, when

24  did UCF Trading Company cease to do business?

25  **A.**  UCF Trading?

**Gagnon - direct by Bueche**

1  **Q.** UCF Trading.  When did UCF Trading Company cease to do

2  business?

3  **A.** In January 2011.

4  **Q.** And after that, it had no sales and no purchases?

5  **A.** No sales, no purchases.

6  **Q.** Okay.  And it was not -- was it paid for any old sales

7  after that point?  Did they continue on into the future?

8  **A.** Do not understand your question.

9  **Q.** Well, there was no sales and no purchases after January of

10 2011; is that right?

11 **A.** That's correct.

12 **Q.** Okay.  Did UCF Trading continue to have inventory at any

13 place after January of 2011?

14 **A.** No.

15 **Q.** Okay.  What happened to the inventory in January of 2011?

16 **A.** Basically, we didn't keep inventory.

17 **Q.** Okay.  I'm going to show your counsel what I marked as YCB

18 Exhibit 3-A, and I'm going to ask you if you recognize that

19 document.

20         THE COURT:  Okay.

21         MR. BUECHE:  Would you like a --

22         THE COURT:  I'm the finder of fact, aren't I?

23         MR. BUECHE:  Yes.  Yes, you are, Your Honor.

24         THE COURT:  Don't you think I ought to have one?

25         MR. BUECHE:  Well, I thought he would see if he

1    recognized it first and then I would tender it to the Court.

2              THE COURT:  I think we ought to hand it to me first.

3              MR. BUECHE:  I'm sorry, Your Honor.  I forgot to ask

4    to approach.

5          (Document tendered to Court.)

6              THE COURT:  I had actually expected documents to be

7    delivered in advance of this so I could review them.

8              All right.  This is marked what again?

9              MR. BUECHE:  3-A, Your Honor.

10             THE COURT:  All right.  Plaintiff's Exhibit 3-A?

11   BY MR. BUECHE:

12   **Q.**  Now, what is the --

13             THE COURT:  Do you recognize it?

14             THE WITNESS:  Yes.

15             THE COURT:  All right.

16   BY MR. BUECHE:

17   **Q.**  And what is the title on the top left of the paper?

18   **A.**  Top left?

19   **Q.**  Yeah.

20   **A.**  "UCF Trading."

21   **Q.**  "Company Limited," isn't it?

22   **A.**  Yes.

23   **Q.**  Okay.  And the date of that invoice is 1/13/2012, isn't it?

24             THE COURT:  I think you may have the wrong --

25             MR. BUECHE:  I'm sorry.  I thought --

1       THE COURT:  Mine's got --

2       THE WITNESS:  I got 5/10/2012.

3       MR. BUECHE:  Okay.  Now --

4       THE COURT:  Plaintiff's Exhibit 3-A is dated

5  5/10/2012.

6       MR. BUECHE:  And if I may approach --

7       THE COURT:  And that refers to the date of May 10th,

8  2012, is that correct?

9       THE WITNESS:  This is May 12 -- no, May 10, May 10.

10       MR. BUECHE:  If I may approach, Your Honor?

11       THE COURT:  You may approach without permission now.

12       MR. BUECHE:  Thank you.

13       THE COURT:  Thank you.

14     (Document tendered to Court.)

15       THE COURT:  But I do like to see the documents, so

16  when there's an error -- for example, you had the wrong date on

17  the last one -- then I could pick up on it.

18       MR. BUECHE:  Yes.  I wasn't really sure what we were

19  doing.  I should have called your clerk ahead of time, Your

20  Honor, to get --

21       THE COURT:  We're having an evidentiary hearing --

22       MR. BUECHE:  Yes.

23       THE COURT:  -- to prove your motion.

24       MR. BUECHE:  Yes.

25  BY MR. BUECHE:

**Gagnon - direct by Bueche**                    **12**

1   **Q.**  I'm going to show you what's been marked as Exhibit 3, and

2   I would ask you to read -- ask if you recognize that document?

3            THE COURT:  Plaintiff's Exhibit 3.  Are you going to

4   offer Plaintiff's Exhibit 3-A?

5            MR. BUECHE:  Yes.  I will offer 3-A into evidence,

6   Your Honor.

7            THE COURT:  Any objection?

8            MR. COSENTINO:  No.

9            THE COURT:  Plaintiff's Exhibit 3-A is admitted in

10  evidence.

11           (Plaintiff's Exhibit 3-A received in evidence.)

12           THE COURT:  Now we're on Plaintiff's Exhibit 3.

13  Do you recognize it, sir?

14           THE WITNESS:  Yes.

15  BY MR. BUECHE:

16  **Q.**  And what is that document, sir?

17  **A.**  It's an invoice.

18  **Q.**  From UCF Trading Company, isn't that right?

19  **A.**  Yes.

20  **Q.**  And the date on that invoice is January of 2012, isn't that

21  right?

22  **A.**  It's January 16, 2012.

23  **Q.**  And that's over a year after you said that UCF Trading had

24  ceased buying and selling, isn't that right?

25  **A.**  I think that we explain that UCF Company was incorporated

1  on the 21st of January, 2011, but actually starting operation

2  in October of 2012.

3          THE COURT:  I didn't hear that in your counsel --

4  well, October 12th of 2012 is when it got a bank account.  So

5  you kept doing business as UCF Trading Company, right?

6          THE WITNESS:  All the marketing was done under UCF

7  Company, but UCF Trading was acting as an agent for UCF

8  Company.

9          THE COURT:  Oh, okay.

10         THE WITNESS:  In waiting of having a business

11  license.  Because you have to understand that in the Bahamas --

12         THE COURT:  Who had a business license?

13         THE WITNESS:  You to operate a company in the

14  Bahamas --

15         THE COURT:  Sir, I asked you a question.

16         THE WITNESS:  Yes.

17         THE COURT:  You have to answer the questions asked by

18  counsel or by me.  Who had the business license?

19         THE WITNESS:  Who has a -- the business license?

20         THE COURT:  That was the question, yes.  You said

21  there was a business license.  Who had the business license?

22         THE WITNESS:  UCF Trading has the business license.

23         THE COURT:  Okay.  All right.  Are you offering

24  Plaintiff's Exhibit 3?

25         MR. BUECHE:  Yes, Your Honor.

**Gagnon - direct by Bueche**                    **14**

1          THE COURT:  Any objection?

2          MR. COSENTINO:  No, Your Honor.

3          THE COURT:  Plaintiff's Exhibit 3 is admitted in

4    evidence.

5          (Plaintiff's Exhibit 3 received in evidence.)

6    BY MR. BUECHE:

7    **Q.**  Now, Mr. Gagnon, do you recall reviewing the rider to the

8    citation to discover assets that was served on UCF Trading?

9    **A.**  If I recall -- I'm sorry.  I don't understand.

10   **Q.**  Do you recall reviewing the citation to discover assets

11   that was served on UCF Trading?

12   **A.**  Yes.

13   **Q.**  And do you recall the request for all documents relating to

14   any payments or transfers of anything of value, whether or not

15   for return consideration, whether tangible or intangible, since

16   July of 2008 by UCF Company to UCF Trading Company or by UCF

17   Company to UCF Company?

18   **A.**  Yes.

19          THE COURT:  You're reading from a document.  May I

20   have that?

21          MR. BUECHE:  Yeah.  It's the citation to discover

22   assets, Your Honor.

23          THE COURT:  Okay.

24       (Document tendered to Court.)

25          THE COURT:  I don't recall being served with it.  Is

1    this an exhibit?

2              MR. BUECHE:  It could be marked as an exhibit, Your

3    Honor.

4              THE COURT:  Okay.  Would you like it to be?

5              MR. BUECHE:  Yes, sir.

6              THE COURT:  What exhibit number would you like on it?

7              MR. BUECHE:  4.  No, excuse me.

8              THE COURT:  All right.  Plaintiff's --

9              MR. BUECHE:  7.

10             THE COURT:  -- Exhibit --

11             MR. BUECHE:  7, please.  I've already marked --

12             THE COURT:  Plaintiff's Exhibit 7?

13             MR. BUECHE:  Yes.

14             THE COURT:  All right.  It wasn't attached to your

15   motion, was it?

16             MR. BUECHE:  I don't know, Your Honor.  I probably

17   just referred to it in the motion because it's in the case

18   file.

19             THE COURT:  Is it in the case file?

20             MR. BUECHE:  Yes.

21             THE COURT:  What's the docket number?

22             MR. BUECHE:  I don't know off the top of my head,

23   Your Honor.  I'm sorry.

24             THE COURT:  Well, then how would I find it?

25             MR. BUECHE:  It -- well, it was filed October 1st of

1  2013.

2          THE COURT:  All right.  Plaintiff's Exhibit 7.

3          MR. BUECHE:  Okay.

4  BY MR. BUECHE:

5  **Q.** Mr. Gagnon, have you provided all the documents that relate

6  to any payments or transfers of assets of any kind from UCF

7  Trading to UCF Company or UCF Company to UCF Trading?

8  **A.** Yes, yes.

9  **Q.** Okay.  Let me show you what's been marked as YCB Exhibit

10  3-B.

11          THE COURT:  Plaintiff's Exhibit 3-B?

12          MR. BUECHE:  Yes.

13          THE COURT:  All right.

14  BY MR. BUECHE:

15  **Q.** And ask you to look at the second page, the one that's

16  marked "Dexter 13" at the bottom.

17          Do you recognize that document?

18  **A.** Yes.

19  **Q.** And it's an invoice from UCF Company to Dexter Axle, isn't

20  it?

21  **A.** Yes.

22  **Q.** And the product that's being sold to Dexter Axle is "CMC

23  taper roller bearings," isn't that correct?

24  **A.** Yes.

25  **Q.** Now, isn't it true that --

**Gagnon - direct by Bueche**                                    **17**

1          THE COURT:  I'm sorry.  You said it's "CMC taper

2     roller bearings"?

3          MR. BUECHE:  Tapered roller bearings, Your Honor.

4          THE COURT:  All right.  I see the "taper roller

5     bearings."  I see "CMC#83."

6          MR. BUECHE:  Right.

7          THE COURT:  Okay.

8     BY MR. BUECHE:

9     **Q.**  Isn't it true, Mr. Gagnon, that UCF Company got those

10    tapered roller bearings from UCF Trading?

11    **A.**  Yes.

12    **Q.**  So at some point in time, there actually was a transfer of

13    assets, inventory maybe, from UCF Trading to UCF Company.

14          Is there any documentation that has yet to be

15    produced that would show any price paid for those tapered

16    roller bearings or the date they were transferred or any return

17    consideration, anything?

18    **A.**  No.

19    **Q.**  Okay.

20          THE COURT:  Are you offering Plaintiff's Exhibit 3-B?

21          MR. BUECHE:  Yes, Your Honor.

22          THE COURT:  All the pages?

23          MR. BUECHE:  Sure, Your Honor.

24          THE COURT:  All right.  It's admitted in evidence.

25          (Plaintiff's Exhibit 3-B received in evidence.)

1          MR. COSENTINO:  No objection, Your Honor.

2          THE COURT:  Thank you.

3          MR. BUECHE:  Excuse me, Your Honor.  I'm missing a

4     page.

5          THE COURT:  While you're going through your papers,

6     sir, could you turn to the front page of Plaintiff's Exhibit

7     3-B, very first page.  Do you have it in front of you, sir?

8     It's titled Bank to Bank Transfer.  Do you see it?

9          THE WITNESS:  3-B?

10         THE COURT:  Yes, Plaintiff's Exhibit 3-B.  Well, it's

11    3-B -- it's down on the side where it says "Dexter0012."

12         THE WITNESS:  Uh-huh.

13         THE COURT:  Okay.  All right.  That very first page,

14    Bank to Bank Transfer, Transmittal, do you see that?

15         THE WITNESS:  Yes.

16         THE COURT:  What is that?

17         THE WITNESS:  This is provided by the bank.

18         THE COURT:  And what does the bank provide it for?

19         THE WITNESS:  For an incoming funds.

20         THE COURT:  Incoming funds?

21         THE WITNESS:  Uh-huh.

22         THE COURT:  Into UCF Trading?

23         THE WITNESS:  Yes.

24         THE COURT:  Transmittal date was January 8, 2013?

25    Right below the words "UCF Trading, Vendor #UN1251"?  Do you

1   see that?

2           THE WITNESS:  January 8, 2013.

3           THE COURT:  Right.  So money was being transmitted

4   into UCF Trading?

5           THE WITNESS:  That's what it appears.

6           THE COURT:  Yeah.

7   BY MR. BUECHE:

8   **Q.**  Mr. Gagnon, have you -- has any checks or wire transfer

9   informations for UCF Trading been produced at all?

10  **A.**  We -- we produce these documents for every month from our

11  bank.

12  **Q.**  But no canceled checks, no deposit slips, no wire

13  informations have been produced, isn't that right?

14  **A.**  We don't have canceled check.

15  **Q.**  Would the bank have canceled checks?

16  **A.**  We don't have canceled check.

17  **Q.**  Would the bank have canceled checks, records of canceled

18  checks?

19          MR. COSENTINO:  I'm going to object insofar as it

20  calls for speculation.

21          THE COURT:  All right.  Sustained.

22          Tell me how you transact business with your bank.

23          THE WITNESS:  Okay.  First of all, we produce an

24  invoice.  This invoice is sent to the customer along with the

25  merchandise.  The customer accept the merchandise.  After the

1  terms established with the customer, the customer will make a

2  payment.  The payment could be done by check or could be done

3  by wire transfer to our company.  And the check is deposited

4  into the bank, and the bank will put this money into our

5  account.  If it's a wire transfer, then it is done directly by

6  the bank into our -- into the company bank account.

7          And then the company bank account is there to pay the

8  supplier by mostly wire transfer, because we deal with foreign

9  companies, so very seldom that it will be paid by check.  It

10  will be paid by wire transfer from our account through our bank

11  to the bank of the supplier.  So this is the way we deal with

12  the bank.

13          THE COURT:  Thank you.

14  BY MR. BUECHE:

15  **Q.**  If I may have the copies I gave you?  Thank you.  And I'm

16  going to present what's been marked as Exhibit No. 5.

17          THE COURT:  Plaintiff's Exhibit 5?

18          MR. BUECHE:  Exhibit 5 is an invoice listing that was

19  produced to me by UCF Trade -- UCF Company.

20      (Document tendered to Court.)

21          THE COURT:  In response to your citation?

22          MR. BUECHE:  Yes.

23          THE COURT:  In response to the citation, Plaintiff's

24  Exhibit 7?

25          MR. BUECHE:  Yes, Your Honor.  Well, no.  That would

1   be Plaintiff's Exhibit 8.  I'm --

2             THE COURT:  Okay.

3             MR. BUECHE:  That would be the citation to UCF

4   Company.

5             THE COURT:  I don't have 8.

6             MR. BUECHE:  No.  I mean, it's just like I didn't

7   bring 7, Your Honor.  I'm sorry.

8             THE COURT:  All right.  You are back on Plaintiff's

9   Exhibit 5.

10  BY MR. BUECHE:

11  **Q.**  If I may point out to you at 1/8/13, invoice 7723, there's

12  an invoice issued to the UCF Trading Company Limited.  Why

13  would UCF Trading issue an invoice -- or, excuse me, why would

14  UCF Company issue an invoice to UCF Trading?

15  **A.**  Okay.  Your question is why UCF Company would issue an

16  invoice to UCF Trading?

17  **Q.**  Yes.

18  **A.**  I presume that it was to purchase goods from UCF Trading

19  Company.

20            THE COURT:  If it was for no amount of money, zero

21  dollars, does that change your view?

22            THE WITNESS:  Because the transaction was for zero

23  dollars.

24            THE COURT:  Right.  I mean, you're purchasing for

25  zero dollars?

1     THE WITNESS:  Yes.

2     THE COURT:  Yes?

3     THE WITNESS:  I mean, if there is a transaction that

4  didn't need any money, then it's zero dollars.

5     THE COURT:  What would UCF Company purchase from UCF

6  Trading for zero dollars?

7     THE WITNESS:  I don't know.

8     THE COURT:  Okay.

9  BY MR. BUECHE:

10  **Q.**  There would be a copy of the purchase -- of a purchase

11  order, wouldn't there?  Or a copy -- at least a copy of the

12  invoice that was issued, wouldn't there?

13  **A.**  Well, for everything that you buy, for everything that you

14  sell, you have a purchase order and you have an invoice.

15  **Q.**  Have any purchase orders or invoices to or by or between

16  UCF Company and UCF Trading been produced?  They haven't, have

17  they?

18  **A.**  I mean, maybe, but I don't know.

19  **Q.**  Let me ask you this.  You told -- your testimony prior,

20  unless I'm mistaken, was that UCF Trading had stopped selling,

21  stopped buying back in January of 2011, but isn't your

22  testimony now that it was actually selling something to UCF or

23  buying something from UCF Company in January of 2013?

24  **A.**  I mean, there were so many transaction that I cannot tell

25  you each transaction, I'm not aware of each transaction.

1  **Q.** Well, but these companies keep records, do they not?  Does

2  UCF Trading still keep records somewhere?

3  **A.** They do keep record, but the records are not the same as

4  what you maybe think that they do in the United States or North

5  America.  I mean, they keep record like it is in the Bahamas,

6  so sometimes the record is different.

7  **Q.** Okay.  I understand that.  But you -- if an invoice was

8  issued to UCF Trading, as it seems to have been, by UCF

9  Company, would that document simply have been thrown away?

10  **A.** I don't think so.  I think it's still there.

11  **Q.** And the purchase order, would that have been thrown away?

12  **A.** I don't think so.  This is year 2013.  I don't think so.

13  Still in the computer.  This is why we made a list of all the

14  transaction, whatever they were zero or whatever they represent

15  a certain amount of money.  You ask us for documents, so we

16  made a list.  Otherwise, I have to bring a truck.

17  **Q.** But I wasn't -- I didn't actually get the invoice itself

18  that was issued to UCF Trading, so I can't tell whether that

19  was for a small amount of goods or for a huge amount of goods,

20  or for a couple of tables or whether it was significant.

21  **A.** Well, I mean, if you --

22  **Q.** Why can't invoices --

23  **A.** If you want to have a copy of this particular transaction,

24  I think it is possible to get you that.

25                    MR. BUECHE:  Okay.  At this point, Your Honor, I have

**Gagnon - direct by Bueche**      **24**

1    made -- I grabbed the wrong check registers, so I don't have

2    copies of something.  If I could have a five-minute recess to

3    go make copies or --

4              THE COURT:  Okay.  How much longer will you be on

5    direct examination of this witness?

6              MR. BUECHE:  I plan to finish up probably 15 minutes

7    after that, no more.

8              THE COURT:  All right.  Okay.  You can make copies in

9    five minutes, you say?

10             MR. BUECHE:  Yes.

11             THE COURT:  Okay.  All right.  We will take a

12   five-minute recess.

13             THE WITNESS:  What do I do?

14             THE COURT:  You may step down and take a break and

15   then be back here in five minutes so that we can resume with

16   your testimony.

17             THE WITNESS:  Thank you, sir.

18             THE COURT:  Thank you.

19        (Recess from 2:36 p.m. until 2:51 p.m.)

20        (Documents tendered to Court.)

21             MR. BUECHE:  I have marked it YCB Exhibit No. 4.

22             THE COURT:  All right.

23             MR. BUECHE:  I'm tendering it to Mr. Gagnon.

24   BY MR. BUECHE:

25   **Q.**  Mr. Gagnon, do you recognize that as a list of invoices of

1    UCF Company?

2    **A.** Yes.

3    **Q.** I just want to point out, isn't it true that exhibit --

4    what's been marked as Exhibit 3, which is invoice No. 7630 --

5                THE COURT:  Plaintiff's Exhibit 3?

6                MR. BUECHE:  Plaintiff's Exhibit 3, which is invoice

7    76 -- 7630 shows up in the list of invoices of UCF Company.

8                THE COURT:  Which is Plaintiff's Exhibit 4?

9                MR. BUECHE:  Yes, Your Honor.

10               THE COURT:  And Plaintiff's Exhibit 5 is UCF Trading?

11   Just trying to keep it straight here.

12               MR. BUECHE:  Yes, Your Honor.

13               THE COURT:  Okay.  Thank you.

14               All right.  Rather than have the witness scroll

15   through the list, which is Plaintiff's Exhibit 4, why don't you

16   help him out.

17               MR. BUECHE:  Yeah.  I've actually marked it, right

18   there.

19               THE COURT:  I don't see it marked on mine.

20               MR. BUECHE:  No.  I didn't mark it on yours, Your

21   Honor.

22               THE COURT:  Okay.  Why don't you help me out.

23               MR. BUECHE:  Okay.  It's on the first page, 73 --

24          (Counsel approaches Court's bench.)

25               THE COURT REPORTER:  Sir, sir --

1          THE COURT:  You can't walk up here.

2          MR. BUECHE:  I'm sorry.  I was actually going to --

3          THE COURT:  That's not proper procedure.

4          MR. BUECHE:  I'm sorry.

5      (Counsel returns to well of courtroom.)

6          THE COURT:  That's not proper procedure.

7          MR. BUECHE:  No, it's --

8          THE COURT:  Just refer me to the invoice number.

9  They're sequential.

10         MR. BUECHE:  7360, Your Honor.

11         THE COURT:  Thank you.

12         MR. BUECHE:  To Dexter Axle.

13  BY MR. BUECHE:

14  **Q.**  And that's actually an invoice that's been marked as

15  Exhibit No. 3, am I correct?

16  **A.**  This is No. 3.

17  **Q.**  Right.

18  **A.**  This is No. 4.

19  **Q.**  Right.

20  **A.**  Well, we explain before that from 2011 to 2012, all the

21  marketing invoices were part of UCF Company, but banking --

22  money in, money out -- was done through UCF Trading because of

23  no permit in the case of UCF Company.  So they were working as

24  agent.

25         So here, as Exhibit 3, you have an invoice from UCF

1    Trading in the case of Dexter Axle Company, and it's listed in

2    UCF Company as sales from UCF Company.

3    **Q.** Okay. Let me show you marked up --

4         MR. BUECHE: And this one I have marked for Your

5    Honor to see --

6         THE COURT: All right.

7         MR. BUECHE: -- what I'm pointing at.

8       (Document tendered to Court.)

9    BY MR. BUECHE:

10   **Q.** And show you and ask you if you recognize this as a monthly

11   statement for the account of UCF Trading at -- I'm sorry, UCF

12   Company at First Caribbean International Bank?

13   **A.** I have to correct. Your Exhibit 2 is UCF Trading.

14   **Q.** Okay. So UCF 2 is a UCF Trading account?

15   **A.** Yes. There's --

16        THE COURT: Plaintiff's --

17   BY THE WITNESS:

18   **A.** The number that it is on top is a UCF Trading account.

19   BY MR. BUECHE:

20   **Q.** Okay. And --

21        THE COURT: When you say "the number on top," which

22   number are you referring to --

23        THE WITNESS: Okay. It say that --

24        THE COURT: -- on Plaintiff's Exhibit 2.

25        THE WITNESS: -- "Account Activity for Account Name:

1  Bahamas, 20315516."  This is UCF Trading.

2          THE COURT:  Oh, okay.

3  BY MR. BUECHE:

4  **Q.** Who -- four down, there's an entry on September 10th, 20 --

5  excuse me.  I think that's actually October 9th.  No, that's

6  September 10th, 2012, from --

7          THE COURT:  Well, how do you know it's September 12?

8          MR. BUECHE:  Well, I --

9          MR. COSENTINO:  If I may, Your Honor?

10          MR. BUECHE:  Is there --

11          MR. COSENTINO:  To verify, the dates are done

12  differently in the Bahamas.

13          MR. BUECHE:  It's an --

14          THE COURT:  That's exactly why I asked the first

15  question I asked about May 10th of 2012, and the witness told

16  me it was May 10th, 2012.

17          MR. COSENTINO:  I just realized it, in looking, that

18  there's no 22nd month of the year of the --

19          THE COURT:  There's no 31st --

20          MR. COSENTINO:  Correct.

21          MR. BUECHE:  Right.

22          THE COURT:  -- month of the year either.

23          MR. BUECHE:  So it is October 9th, yes.

24          THE COURT:  How do you know it's October 9?

25          MR. BUECHE:  Because there -- this is supposedly

**Gagnon - direct by Bueche**                          **29**

1    using the same convention all the way up and down.

2              THE COURT:  Okay.

3              MR. BUECHE:  And there's a 31st of something, and

4    that would have -- that would have to be date, not a month.

5              THE COURT:  Maybe you should ask the witness.

6              MR. BUECHE:  Okay.

7    BY MR. BUECHE:

8    **Q.**  You've lived in the Bahamas, Mr. Gagnon.  What's the

9    convention for telling a date?  Is it the date first, then the

10   month?

11   **A.**  It depends.  You know, if you're English or if you're

12   American, they will use different dates.

13   **Q.**  Okay.

14   **A.**  If you're French, you're going to use a different way of

15   doing your dates.  But the bank used the English way.

16             THE COURT:  All right.  The bank used the English

17   way.  Thank you.

18   BY MR. BUECHE:

19   **Q.**  And is the English way the day is first, then the month?

20   **A.**  Day first, month --

21             THE COURT:  Day, month, year.  Let's move on.

22             MR. BUECHE:  All right.

23   BY MR. BUECHE:

24   **Q.**  The four -- the fifth entry down, it says From and there's

25   a number there, and there's a credit of $494,419.96.

1          THE COURT:  Plaintiff's Exhibit 2.

2          MR. BUECHE:  Yes.

3    BY MR. BUECHE:

4    **Q.** That is actually a transfer from UCF Company's account,

5    isn't it?

6    **A.** Yeah, this is the loan from the bank.

7    **Q.** From the bank?

8    **A.** This is a bank loan.

9    **Q.** To whom?

10   **A.** To UCF Trading.

11          THE COURT:  Okay.

12   BY MR. BUECHE:

13   **Q.** In October of 2012?  Have any of those loan documents been

14   produced?

15   **A.** I mean, the loan is from a long time and it could be

16   produce.

17   **Q.** Okay.

18          THE COURT:  That wasn't the question.  Has it been

19   produced?

20          THE WITNESS:  No, it hasn't been produce except

21   produce by the bank here as the statement of the bank, but not

22   as a contract.

23   BY MR. BUECHE:

24   **Q.** And this money came by way of a UCF Company account, isn't

25   that right?  That is a UCF Company account number that is on

**Gagnon - direct by Bueche**

1  that line, that is, 201628951?  That's a UCF Company account,

2  isn't it?

3  **A.**  Yes.

4  **Q.**  Down towards the bottom, I have circled transactions

5  that -- actually, I'm only concerned about the bottom one,

6  which is "UCF Trading," and it's a check for $5,000 -- or a

7  withdrawal of $5,000.

8       What can you tell me about that transaction?  Would

9  there be any documents attached to it?

10  **A.**  It's a withdrawal.

11  **Q.**  I'm sorry?

12  **A.**  I mean, this is money out.

13  **Q.**  Right.  Why would there be a -- is it a check to UCF

14  Trading?

15  **A.**  I wouldn't know.

16  **Q.**  Okay.  And there's been no actual physical checks or wire

17  transfers produced to us today so that we could see better

18  descriptions of what these items are, isn't that right?

19  **A.**  Could you repeat that again?

20  **Q.**  There's been no checks or wire transfers or deposit

21  materials that would underlie these monthly statements so that

22  we could see where the money comes from and where it goes to?

23  **A.**  We would have to ask the bank to produce such a document.

24  **Q.**  Have you asked the bank to produce them?

25  **A.**  We asked the bank to produce a statement, which they gave

**Gagnon - direct by Bueche**                    **32**

1    us a statement, but they didn't give us the actual check

2    return.  I mean, this is different.

3    **Q.**  Where else did -- what warehouses did UCF Trading have

4    inventory in, say, January of 2011?

5           I'm sorry.  When did you say UCF Trading stopped

6    buying and selling?

7           THE COURT:  Are you withdrawing the last question?

8           MR. BUECHE:  Yes, I am.  Thank you.

9    BY MR. BUECHE:

10   **Q.**  Are you saying that UCF Trading stopped business in January

11   of 2011 or 2012?

12   **A.**  20 -- 2011.

13   **Q.**  Okay.  Were there any -- was there any inventory at any

14   warehouses that belonged to UCF Trading just before it stopped

15   business?

16   **A.**  No.

17   **Q.**  Okay.  How about in, say, December of 2010?  Did -- was

18   there any inventory in any warehouses?

19   **A.**  I wouldn't be able to tell you every month of the

20   inventory.  I wouldn't be able to tell you that.  But I know

21   that in January, we had no more inventory.

22   **Q.**  In January of 2011?

23   **A.**  2011.

24          MR. BUECHE:  All right.  I'll pass the witness.

25          THE COURT:  All right.  Let me inform counsel that

1    during the break, I went to the website listed as paragraph 8

2    of the motion filed by the plaintiff and observed that website.

3              You may proceed.

4              MR. COSENTINO:  Thank you, Your Honor.

5              THE COURT:  You may inquire about the website, if you

6    desire.  It's --

7              MR. COSENTINO:  Mr. Gagnon --

8              THE COURT:  -- available to you folks as it is to me.

9    I'm just informing you that I have observed it.

10             MR. COSENTINO:  Thank you, Your Honor.

11                        CROSS-EXAMINATION

12   BY MR. COSENTINO:

13   **Q.**  Mr. Gagnon, you were asked questions on direct examination

14   by Mr. Bueche with regard to documents that you had produced,

15   and that's why we're here today, to make sure that you produced

16   everything you were asked.

17             Have any of the documents that Mr. Bueche asked you

18   to produce, anything related to any bank transactions that has

19   not heretofore been produced, do you or does UCF Trading

20   Company have anywhere that you have access to those documents

21   readily at hand?

22             THE COURT:  There are a lot of provisos in that

23   question.

24             MR. COSENTINO:  Okay.

25             THE COURT:  "Readily at hand."

1          MR. COSENTINO:  I'm sorry.

2          THE COURT:  "You have access to."

3          MR. COSENTINO:  I'm sorry.

4          THE COURT:  I mean, this man is the president of the

5     company.

6          MR. COSENTINO:  Well, I understand.

7          THE COURT:  He's president of both companies.

8          MR. COSENTINO:  That is correct.

9          THE COURT:  So he is the person in charge of both

10    companies.  So, as far as "has access to," there should be no

11    proviso on that at all.

12         MR. COSENTINO:  I understand, Judge.

13         THE COURT:  He has complete access.

14    BY MR. COSENTINO:

15    **Q.**  Mr. Gagnon, you were asked to produce documents relating to

16    bank transactions for UCF Trading Company, correct?

17    **A.**  Yes.

18    **Q.**  Okay.  During the course of this post-judgment proceeding,

19    did you turn over to counsel bank statements for UCF Trading

20    Company for the years 2011 and 2012?

21    **A.**  All what we had.

22    **Q.**  Okay.  Did you turn over the sum and substance, everything

23    that you had with regard to those bank transactions?

24    **A.**  Everything that we had.

25    **Q.**  Okay.  With regard to the specific invoices that Mr. Bueche

1    has asked you about, I refer you to Plaintiff's Exhibit 4,

2    Plaintiff's Exhibit 5, which are -- which is a list of the

3    invoices that were generated by UCF Company.

4            Do you recognize these two documents?

5    **A.**  I don't have them --

6            THE COURT:  Let me make sure I've got it --

7            THE WITNESS:  You mean YCB No. 4?

8            MR. COSENTINO:  Wait, wait.

9            THE COURT:  YCB Company is Exhibit 4.

10           MR. COSENTINO:  Yes.  I'm sorry.  What --

11           THE COURT:  I'm not exactly sure what Exhibit 5 is.

12           THE WITNESS:  I don't have Exhibit 5.

13           THE COURT:  Mr. Bueche, what do you purport Exhibit 5

14   is?

15           MR. BUECHE:  Exhibit 5 is invoices from -- or

16   invoices of 2013 from UCF Company.  So these are 2013 invoices.

17           THE COURT:  Who?  From YCB Company?

18           MR. BUECHE:  From UCF Company.

19           THE COURT:  I'm sorry.  UCF Company?

20           MR. BUECHE:  Yeah.

21           THE COURT:  You've got "YCB" on here, and --

22           MR. BUECHE:  I scribbled --

23           THE COURT:  -- that screwed me up.

24           MR. BUECHE:  -- just who's offering the exhibit, Your

25   Honor.

1          THE COURT:  Yeah.  Well, "Plaintiff" is what I used

2    so there wouldn't be confusion, so that's why I wanted you to

3    use "Plaintiff."  You have insisted on adding the letters.

4          So both are UCF Company.  One is for 2013, one is for

5    2012; is that correct?

6          MR. BUECHE:  Yes, sir.

7          THE COURT:  All right.

8    BY MR. COSENTINO:

9    **Q.** Now, as the president --

10         THE COURT:  And there's no objection to those being

11   admitted in evidence?

12         MR. COSENTINO:  There is not.

13         THE COURT:  Okay.

14   BY MR. COSENTINO:

15   **Q.** As the president of UCF Company, Mr. Gagnon --

16         THE COURT:  Plaintiff's Exhibits 5 and 4 are admitted

17   in evidence.

18      (Plaintiff's Exhibits 4 and 5 received in evidence.)

19         THE COURT:  You may proceed.

20   BY MR. COSENTINO:

21   **Q.** As the judge has pointed out, you have access to documents

22   for both companies.  In response to the citation that was

23   served on both UCF -- the citations, rather, that were served

24   on UCF and UCF Trading, did you produce these documents, which

25   is a breakdown of the invoices generated by UCF Company?

1    **A.**  Yes, I did.

2    **Q.**  Now, you had mentioned, I believe, during direct

3    examination that if you were to produce all of the invoices

4    referenced in these documents, it would take boxes and boxes or

5    whatever the quote might have been.  I'm not sure.

6              THE COURT:  He said truckloads.

7              MR. COSENTINO:  Truckloads.  I'm sorry.

8    BY MR. COSENTINO:

9    **Q.**  UCF Company has these documents available someplace,

10   somewhere, presumably in the Bahamas, where you could pick out

11   any one of these invoices if it was specifically requested by

12   Mr. Bueche; is that correct?

13   **A.**  Yes.

14   **Q.**  Okay.

15             THE COURT:  Well, actually, don't you have them on

16   the computer?

17             THE WITNESS:  Yes.

18             THE COURT:  Yeah.  You could actually transmit them,

19   not in trucks, but you can transmit them electronically,

20   correct?

21             THE WITNESS:  Yes.

22             THE COURT:  Yeah.

23             THE WITNESS:  Of course.

24             THE COURT:  So it's not really truckloads.

25             MR. COSENTINO:  Sure.

1          THE COURT:  It's just a number of transmittals

2     electronically.

3          MR. COSENTINO:  Right.

4     BY MR. COSENTINO:

5     **Q.**  So you could put all of these invoices onto a flash drive

6     or a zip drive and send it electronically, is that correct?

7     **A.**  Yes.

8     **Q.**  Okay.  Now, there seems to be -- I'd like to turn your

9     attention to what's been marked as YCB Exhibit 3-B.

10          THE COURT:  Well, can we use "Plaintiff's"?

11          MR. COSENTINO:  Plaintiff's Exhibit 3-B.

12          THE COURT:  It's so much easier.

13          MR. COSENTINO:  I'm sorry, Your Honor.

14          THE COURT:  It's the plaintiff that's also the moving

15     party.  It's just easier.

16          MR. COSENTINO:  Understood.

17          THE COURT:  "Plaintiff."  And any initial related to

18     the responding party for the defendant.

19          MR. COSENTINO:  I understand.

20          THE COURT:  Yeah.

21     BY MR. COSENTINO:

22     **Q.**  Now, the very first page is the bank to bank transfer,

23     transmittal, and it says "To:  UCF Trading."

24          Do you have this document in front of you still?

25     **A.**  Yes.

1    Q.  Okay.  Could you please pull it out so you can reference

2    it.  I wanted to ask you a couple questions about it.

3            This document on top, the very first page of Exhibit

4    3-B, this is not a document that you generated, correct?

5    A.  This is a document that we had in our file.

6    Q.  I understand.  I asked if you -- if this was a document

7    that you generated or your company generated, this first page.

8    A.  This is generated by our bank.

9    Q.  Okay.  Now, it looks like --

10           THE COURT:  May I just inquire?  Do you recognize the

11   signatures on there?

12           THE WITNESS:  After the -- during the break, I look

13   at this thing and it comes from a payment from a customer.

14           THE COURT:  Right.

15           THE WITNESS:  Dexter.  It's mark.  And these are

16   coming from Wachovia Bank, so I don't know the signatures of

17   the directors of Wachovia Bank.

18           THE COURT:  Okay.

19           THE WITNESS:  But it came to our account.

20   BY MR. COSENTINO:

21   Q.  Corresponding with the bank to bank transfer, transmittal,

22   Exhibit 3-B, is an invoice that is invoice No. 7716, and it

23   says "UCF Company Limited."  This is the second page of Exhibit

24   3-B.

25           Is it your testimony, Mr. Gagnon, as you sit here

1    today, that this bank to bank transfer, transmittal reflects

2    payments that were made to UCF Company or UCF Trading Company?

3    **A.**  To UCF Company.

4    **Q.**  Okay.  I'll turn your attention back to Exhibit 5.

5              THE COURT:  Plaintiff's Exhibit 5.

6    BY THE WITNESS:

7    **A.**  I don't have Exhibit 5.

8              MR. BUECHE:  I have it.  I took it back.

9              MR. COSENTINO:  Permission to approach?  He can use

10   mine.

11             THE COURT:  You may.

12   BY MR. COSENTINO:

13   **Q.**  Mr. Gagnon, do you see on Exhibit 5, towards the top, a

14   reference to invoice 7716?

15   **A.**  Yes.  It's Dexter Axle Company.

16   **Q.**  And just so we're clear, that is an invoice list for UCF

17   Company, correct?

18   **A.**  Yes, yes.

19   **Q.**  Now, you testified that from the time UCF Company was

20   incorporated in the Bahamas, in 2011, for nearly two years

21   thereafter, I think, it did not have a bank account.

22             Could you elaborate for us, because I'm not sure that

23   we're clear, why it was that UCF Company never established a

24   bank account of its own while it was doing business from 2011

25   on?

1          THE COURT:  Well, wait.  You have now posed a

2    question on into the present and into the future.

3          So it's never had a bank account?

4          MR. COSENTINO:  No, no.  It has one now, Your Honor.

5          THE COURT:  Well, you just said "never had a bank

6    account."

7          MR. COSENTINO:  I'm sorry.  That was a poor question.

8          THE COURT:  Yeah.

9    BY MR. COSENTINO:

10   **Q.**  Why it did not have a bank account for the first nearly two

11   years of its formation -- from two years of its formation on,

12   why it did not have a bank account?

13   **A.**  UCF Company was incorporated on the 21st of January of

14   2011.

15   **Q.**  Okay.

16   **A.**  And the rules of the Bahamas is that you have to have a

17   business license to have a bank account in U.S. dollars.  You

18   could have bank account in Bahamian dollars -- a lot of people

19   transact in Bahamian dollars -- but we were connected to

20   foreign countries, so we had to deal with U.S. dollars.  So you

21   have to have a business license, and the business license was

22   given to UCF Company sometime at the beginning of 2012.

23          In 2012, we went to our bank and we ask for -- to

24   open a bank account in U.S. dollars for UCF Company, which we

25   did in October of 2012.  And until you have a bank account,

1    there's nowhere to go.

2    **Q.** So because UCF Company did not have a bank account, did UCF

3    Company enter into an arrangement with UCF Trading Company

4    whereby, as you testified, UCF Trading Company would act as an

5    agent for UCF Company?

6    **A.** Exactly.  So during that time --

7            THE COURT:  Is that written down, like a written

8    contract, or did you just agree with yourself, as the president

9    of both companies, that that's how you were going to do

10   business?

11           THE WITNESS:  Well, we had -- there was no written

12   contract between the two companies.  It's just that UCF Trading

13   owed so many dollars to me that we could do some transaction

14   without any documents sign.  So we just use the bank account of

15   UCF Trading to do the transaction until UCF Company was able to

16   obtain a bank account.

17   BY MR. COSENTINO:

18   **Q.** In --

19           THE COURT:  And when was the UCF Trading bank account

20   opened again?

21           THE WITNESS:  Well, UCF Trading bank account was open

22   20 years ago.

23           THE COURT:  Okay.  And UCF Company's bank account, it

24   was opened when?

25           THE WITNESS:  In -- UCF Company bank account was open

Gagnon - cross by Cosentino                    **43**

1    in October of 2012.

2    BY MR. COSENTINO:

3    **Q.**  After the business license was issued by the government of

4    the Bahamas?

5    **A.**  Yes.

6    **Q.**  Okay.  In Mr. Bueche's petition for rule to show cause, he

7    asks for tax returns.  Are there any tax returns to be produced

8    by UCF Trading Company?

9    **A.**  I mean, it's well known that the Bahamas is a fiscal

10   paradise, and there's no such thing as income tax, so nobody is

11   paying any income tax in the Bahamas.

12   **Q.**  In his petition for rule to show cause --

13              THE COURT:  Are there other tax returns?

14              THE WITNESS:  There is real estate tax and there's

15   duty tax when you import goods into the Bahamas.

16              THE COURT:  Do you have any of those tax returns?

17              THE WITNESS:  If I -- pardon me?  May I -- I didn't

18   hear it.

19              THE COURT:  Do you?

20              THE WITNESS:  If I have any other tax?

21              THE COURT:  Yeah.

22              THE WITNESS:  Well, we're paying real estate tax and

23   we're paying duty tax on goods that we import.  Like if you

24   want to import a car, then you have to pay duty on.

25   BY MR. COSENTINO:

1  **Q.** Mr. Bueche also in his petition for rule to show cause

2  raises the fact that there were no bank account -- there was no

3  bank account information produced for UCF Trading.

4        I ask you initially, the bank account information

5  that you produced from UCF Trading Company, is that all of what

6  you have in terms of bank account information for UCF Trading

7  Company?

8  **A.** Yes.

9  **Q.** Mr. Bueche raises the fact in his petition for rule to show

10  cause that nothing has been produced with respect to payments

11  from either, I think, UCF Company or UCF Trading Company to you

12  as the president.

13        Insofar as you know, has your counsel produced that

14  information to Mr. Bueche?

15  **A.** My salary?

16  **Q.** Yes.

17  **A.** You -- I have produce a list of all my salary since 2009.

18        MR. COSENTINO:  If I may just take a moment, Your

19  Honor?

20        THE COURT:  All right.

21     (Pause.)

22        MR. COSENTINO:  I don't think I have anything further

23  for Mr. Gagnon, Your Honor.

24        THE COURT:  All right.  Redirect?

25        MR. BUECHE:  Yes.

REDIRECT EXAMINATION

BY MR. BUECHE:

**Q.** Mr. Gagnon, salary wasn't the only thing that you received from UCF Trading since 2008, isn't it? Didn't you also receive monies for some other purpose besides your salary?

THE COURT: You may lead the witness.

BY MR. BUECHE:

**Q.** Like reimbursing for expenses or repaying loans, things of that nature?

**A.** I gave a list of everything that was paid to me every year. There was a complete list given. So I don't know if you got the list, but I made it on purpose to do that myself.

**Q.** And what did you use to make that list?

**A.** I use the accounting, general ledger. I use all the accounting that we had.

**Q.** Uh-huh.

**A.** And then I went line by line, and then whatever it was attribute to me, then I put it as a salary.

**Q.** Okay. But those general ledgers have not been produced to me, have they? You haven't provided them to your attorney. You've just gotten the information and given us that, right?

**A.** I don't know. I think that we produce all the documents that we had.

**Q.** Okay. Well -- but not the ledgers that you used to get the amount that you say you received --

1    **A.** We use --

2    **Q.** -- from UCF --

3    **A.** -- computers, so, you know, I mean, it's -- we don't have a

4    ledger like that.

5    **Q.** Well, it's a computerized ledger, then, right?  I mean,

6    it's not paper.  It's --

7    **A.** I mean --

8    **Q.** But you looked at something that was not produced to me,

9    basically, isn't that right?

10   **A.** I don't know what your question.

11   **Q.** Okay.  It's really very simple.  You say you looked at

12   computer data and made a summary for me, but you didn't provide

13   the actual computer screens or ledger entries or any of that

14   original data to me, right?

15   **A.** I didn't give you my computer, no.

16   **Q.** Okay.  And just one last question about opening up the bank

17   account.  What was the hurry in opening up a bank account?  I

18   mean, why did UCF Company begin business without a bank

19   account?  Couldn't it have waited until October of 2012?  Or

20   was there a reason that you were in a hurry?

21   **A.** Because we were told that we could obtain the business

22   license immediately.  But in the Bahamas, things happen

23   differently, so we got it a year later.

24   **Q.** But you didn't wait until the account -- till the bank

25   allowed an account before starting business with UCF Company,

**Gagnon - redirect by Bueche**                        **47**

1   isn't that right?

2   **A.** Could you repeat that, please?

3   **Q.** You did not wait until there was a UCF Company bank account

4   before starting business of UCF Company?

5   **A.** No, because -- you have to understand that UCF Trading had

6   no more asset and had no more way of doing business.

7   **Q.** Uh-huh.

8   **A.** So we had to reinvest money and I was not going to put more

9   money into a company that was losing money.  So this is the

10  reason that we started another company to invest money in, and

11  this is why we started immediately.  And we thought we could

12  have the business license immediately, but it was not given to

13  us.

14              MR. BUECHE:  Thank you.  I have no further questions.

15              THE COURT:  All right.  Further examination of this

16  witness?

17              MR. COSENTINO:  No, Your Honor, nothing based on

18  that.

19              THE COURT:  All right.  You may step down.  Call your

20  next witness.

21              THE WITNESS:  What do I do with these papers?

22              THE COURT:  You may step down and hand the documents

23  to counsel.  You can give them to Mr. Bueche.

24              MR. BUECHE:  I have no further witnesses on the issue

25  that's been produced, Your Honor.

Bueche - closing                          **48**

1    THE COURT:  Any witnesses on behalf of the respondent
2  or the defendant?
3    MR. COSENTINO:  No, Your Honor.
4    THE COURT:  All right.  All right.  We have heard all
5  the testimony we're going to hear.  I will hear counsel in
6  closing arguments.
7         CLOSING ARGUMENT ON BEHALF OF PLAINTIFF
8    MR. BUECHE:  Gregory Bueche for YCB, Your Honor.
9    I think it's -- first it's --
10    THE COURT:  You may step down.
11    MR. BUECHE:  Yeah.  I'm sorry.
12    THE COURT:  You may sit with your counsel at counsel
13  table.
14      (Witness excused.)
15    MR. BUECHE:  I think that we spent a lot of time
16  trying to figure out whose banking accounts belong to who and
17  what was paid to who and what deposits were made.  If checks
18  and wire transfers and depository records had been produced as
19  required by paragraph 1 of the citation, we wouldn't be
20  bothering the Court with this.  And it is available.  It's not
21  readily available right away, easily, but at least it's at the
22  bank.
23    The second thing is that the customers and the
24  invoices are confused, and the only reason why we even know
25  whose invoices have what on top of them is that I've subpoenaed

1   one customer, Dexter Axle, and we saw UCF Trading sending out

2   invoices, being claimed by UCF Company as their receivable, and

3   that -- I don't know how many times we need to see that when

4   there's only one company that we were able to get a hold of.

5          Now, I can subpoena every single company, but I think

6   it's probably better for the receivables and the invoices to be

7   produced as required, as part of the books and records.

8          And then we did ask for all the transactions between

9   UCF Company and UCF Trading, and we got nothing aside from what

10  I could glean from the check registers and the invoice

11  listings, and that just raised more questions than it answered.

12         I would like my own answers to these questions by

13  seeing the actual documents, just like I would like to see the

14  actual documents relating to the salary or supposedly that was

15  paid to Mr. Gagnon.

16         And I know that this sort of blends into the issue of

17  whether or not they're the same companies, but it really

18  doesn't.  I mean, it doesn't if they actually produce what they

19  could themselves call to be UCF Trading Company documents.

20         So Your Honor will make a decision in equity.  I

21  would like to move forward.  I don't -- didn't want to be here

22  in this supplemental proceeding in this court in the first

23  place.

24         THE COURT:  Nor did I want you here.

25         MR. BUECHE:  I know, Your Honor.  I was sent here by

Cosentino - closing                                    **50**

1    the state court, believe it or not, because you had the

2    original case.  And this is not difficult to figure out.  Thank

3    you.

4              THE COURT:  All right.  Response.

5              MR. COSENTINO:  Thank you, Your Honor.

6              CLOSING ARGUMENT ON BEHALF OF DEFENDANT

7              MR. COSENTINO:  Judge, I don't want to lose sight of

8    the fact that we're here for a very limited reason today, and

9    obviously --

10             THE COURT:  What is that limited reason?

11             MR. COSENTINO:  The limited reason is to determine

12   whether or not Mr. Gagnon or whether or not UCF Trading should

13   be held in contempt of court for failing to produce documents

14   in response to a third-party citation -- or strike that -- in

15   response to a debtor citation.

16             Mr. Gagnon testified that he's produced everything

17   that he has.  Now, it's my understanding that unless he is

18   ordered by the Court to do so, he's under no obligation to go

19   out and get documents that are not available to him or that he

20   does not have access to.  Because it seems to me as if he does

21   not have the documents and he has to get them from the bank,

22   there's going to be some expense that has to be borne,

23   especially if we're talking about the type of detailed banking

24   information that Mr. Bueche is referring to.

25             We produced the bank account information in response.

Cosentino - closing

1    If Mr. Bueche wants more, I will be more than happy to speak

2    with Mr. Bueche about what exactly it is that he wants.  But

3    we'd have to determine how much it's going to cost to get these

4    from UCF Trading's bank, First Caribbean International Bank,

5    and then determine who's going to bear the expense of that.

6              It's evident, I think, to me, as it is to the Court,

7    that where Mr. Bueche is headed with this is a potential either

8    successor liability or alterego claim, but that's not why we're

9    here.  So while the accounting practices of UCF Trading and UCF

10   Company, for that matter, might leave much to be desired,

11   especially in the eyes of this Court, especially in the eyes of

12   the way Americans generally do business, we're here to

13   determine whether or not UCF Trading willfully not -- did not

14   comply with the citation.  And I think based on Mr. Gagnon's

15   testimony that he has produced everything that was asked of him

16   that he had, I don't think Mr. Bueche has met his burden.

17             If Mr. Bueche wants to narrow down the request, if he

18   wants to make specific requests rather than casting as wide of

19   a net as he has, I think we could probably reach a pretty

20   speedy resolution.  But if Mr. Gagnon had to go to UCF Trading

21   Company's bank and request this information, I think it's going

22   to cost countless dollars.

23             So I don't know that Mr. Bueche has met his burden.

24   I don't think that he has.  It's obviously up to the Court to

25   make that determination.  But I think his testimony that he has

1    produced everything that he has, and done so in good faith,

2    means that the Court should not hold him in contempt of court.

3              THE COURT:  Thank you.

4              MR. COSENTINO:  Thank you.

5              THE COURT:  Anything further?

6               REBUTTAL ARGUMENT ON BEHALF OF PLAINTIFF

7              MR. BUECHE:  If there was a huge financial burden of

8    producing these documents, there should have been an objection

9    and we could have discussed it back in October, not after a

10   rule to show cause hearing.  Thank you.

11             THE COURT:  All right.  I believe that Mr. Gagnon has

12   willfully violated the request for citation to discover assets.

13             I believe that Mr. Gagnon, as president of both UCF

14   Trading and UCF Company, has access to the documents and

15   transactions engaged in by both companies.  For purposes of

16   responding to the citation to discover assets, Mr. Gagnon

17   should have provided the documentation and the financial

18   records that were called for from one or both companies in each

19   of the numbered paragraphs.

20             I believe the numbered paragraphs were sufficiently

21   limited and clear in scope so as to provide sufficient

22   information so a responding party such as Mr. Gagnon, in the

23   position that he is in, and has been in, could identify and

24   provide the information.

25             Documents such as Plaintiff's Exhibit 5 and

1    Plaintiff's Exhibit 4 are not responsive. As counsel for UCF

2    pointed out, these documents themselves could be placed on a

3    flash drive and provided. It wouldn't take truckloads.

4    Mr. Gagnon wanted me to believe that the documents themselves

5    would be truckloads, but, in fact, the business that he engages

6    in is almost exclusively electronic.

7    And so I believe there has been an attempt, a willful

8    attempt to evade the production requirements. I'm going to

9    order that Mr. Gagnon, UCF Trading, UCF Company provide all of

10    the documents that are called for in the citation to discover

11    assets, and that they provide those documents no later than

12    three weeks from today in a means and through a mechanism

13    dictated by Mr. Bueche.

14    Today is the 18th of February. That's the 11th of

15    March. We're going to set the case for a further status on the

16    18th of March.

17    If there is a failure to provide documentation, then

18    beginning on the 18th of March, retroactive to the 12th of

19    March, I will enter a financial sanction that will accrue on a

20    daily basis until there is complete compliance with the

21    citation to discover assets. It will be an escalating

22    financial sanction that will escalate at a reasonable rate

23    until there is compliance. It will be a civil contempt

24    sanction that is totally in the control of Mr. Gagnon, UCF

25    Trading, UCF Company to comply with.

1      So I am going to ask you one more time, before I

2  impose the sanction.  But I am making the finding today that

3  this was a willful violation.  To see this man on the witness

4  stand try to be deceptive as he was I think indicates what has

5  transpired here.  There was an attempt to avoid the disclosure

6  of information.  That's the ruling.

7      With regard to the dicta, as I said, I looked at the

8  website.  The website is copyrighted by UCF Trading.  That

9  means UCF Trading is the owner of the website of UCF Company.

10  That means that all representations made on the website, which

11  is *www.ucftrading.com*, are UCF Trading or they couldn't own a

12  copyright.

13      And so, consequently, I would think that you folks

14  ought to try to resolve this case before we move forward

15  regarding the corporate liability of UCF Company for the

16  transactions and the judgments entered against UCF Trading.  I

17  strongly recommend that.  I, frankly, think that you folks

18  should get this resolved.  If you don't, we'll proceed to the

19  next level.

20      Transactions in the Bahamas are transactions in the

21  Bahamas, but if you're going to do business in the United

22  States, you have to comply with the United States law.  And so

23  this judgment that was entered by a United States District

24  judge is under the laws of the United States and there must be

25  compliance therewith.

1               All right.  I will see you on the 18th of March.  I

2    would like to have you folks come on in and tell me that you

3    resolved the matter.

4               MR. BUECHE:  Your Honor, I have a family vacation

5    planned from the 12th to the 26th of March.  If you'd like to

6    build more time in for counsel to work on documents or --

7               THE COURT:  You want to give them until the 18th?

8               MR. BUECHE:  Sure.  And then see --

9               THE COURT:  All right.  It will be the 18th.

10              MR. BUECHE:  And see you April 1st, perhaps?

11              THE COURT:  Absolutely not.

12              MR. BUECHE:  Okay.

13              THE COURT:  You see, I'm out on April 1st.  April

14   3rd.

15              MR. BUECHE:  April 3rd.  Okay.

16              THE COURT:  If there isn't compliance, if I don't

17   hear from you folks on April 3rd that there has been

18   compliance, then retroactive to March 18th, the sanction will

19   commence.

20              MR. COSENTINO:  Your Honor, may I get clarification?

21              THE COURT:  I love it when counsel ask for

22   clarification.

23              MR. COSENTINO:  I appreciate your being facetious,

24   Judge, but I have a genuine request here.

25              THE COURT:  I am not being facetious.  I love it

1    because that makes it clearer.

2         MR. COSENTINO:  I'm looking at the motion for rule

3    to -- or petition for rule to show cause --

4         THE COURT:  Yes.

5         MR. COSENTINO:  -- filed by Mr. Bueche, and

6    specifically paragraph 6 where he seems to highlight the

7    documents that he asserts are missing.

8         What I would propose, and I don't know that the Court

9    needs to babysit this, but I would like to sit down with

10   Mr. Bueche and use this as our baseline for what he believes is

11   still missing, unless there are other documents that I'm

12   missing, because I think this is what he brought the rule based

13   upon.

14        MR. BUECHE:  Your Honor, I think counsel should sit

15   down with Mr. Gagnon and obtain the documents that you have

16   referred to from the bench.

17        MR. COSENTINO:  And, obviously, I will do that.  But

18   I'm -- again, I'm referring to the petition for rule, and

19   specifically the way he's got, I believe, six subparagraphs,

20   categories of documents that he's alleging are missing.

21        THE COURT:  The proof today went beyond that.  The

22   proof today talked about tax returns.  This man said, "Oh, we

23   don't file tax returns because there aren't any tax returns."

24        MR. COSENTINO:  That was --

25        THE COURT:  But there are tax returns.  There are

1    duty returns and there are real estate tax returns.  That

2    hasn't been produced.

3           The proof went beyond the petition.  The petition

4    doesn't limit the proof.

5           MR. COSENTINO:  I understand.  And, actually, tax

6    returns are listed in 6(c).  Those were the -- that's -- those

7    are the documents --

8           THE COURT:  And you didn't produce them.

9           MR. COSENTINO:  I understand.

10          THE COURT:  Willfully.

11          MR. COSENTINO:  I'm not -- I don't mean to anger the

12   Court.  I'm just trying to -- I want to make sure that we do

13   comply, Judge, that we don't come back in here and have a --

14          THE COURT:  Well, then what you should comply with is

15   not to try to wheedle away your noncompliance by saying, "Oh,

16   you know, he didn't really complain about that."

17          I saw for the first time today, in my opinion, how

18   deceptive this man is and how he is attempting to deceive and

19   has attempted to deceive.  I mean, this whole scenario of an

20   agency that was made up, apparently, in his mind to try to have

21   some legal demonstration of separateness just does not exist.

22   There is no separateness as far as I can tell.

23          I am not making a determination today on that, but I

24   will at some point if pushed to do so, and I will take into

25   account all of the evidence, as I took into account today all

1    of the evidence.  If you want to try to nitpick, I'm telling

2    you now is not the time to nitpick.  Now is the time to comply.

3                MR. COSENTINO:  That's my intention, Your Honor.

4                THE COURT:  You have been, apparently, nitpicking

5    before, as has your client, "Oh, we don't have tax returns

6    because the Bahamas is a financial paradise."  It didn't say

7    "income tax returns."  It said "tax returns."  Now, that may be

8    a minor point on this, but it shows a mentality of deception

9    and lack of truthfulness that has come through loud and clear

10   today.

11               I am giving you an opportunity -- I am not imposing

12   sanctions today.  I am giving you an opportunity to comply, but

13   there will be sanctions -- and I have imposed substantial

14   sanctions on foreign companies when necessary, and I will do so

15   again when necessary.  I am hoping it will not be necessary.

16   I'm basically giving you a second chance, saying, "Look, you

17   haven't pulled the wool over my eyes yet."  I'm giving you

18   another chance to be truthful and candid and forthright.  Okay?

19               MR. COSENTINO:  Very good.

20               THE COURT:  All right.

21               MR. COSENTINO:  Thank you, Judge.

22               THE COURT:  We'll see you then.

23           (Proceedings concluded.)

24

25

1            C E R T I F I C A T E

2

3

4

5            I, Colleen M. Conway, do hereby certify that the

6    foregoing is a complete, true, and accurate transcript of the

7    Evidentiary Hearing proceedings had in the above-entitled case

8    before the HONORABLE JAMES F. HOLDERMAN, one of the Judges of

9    said Court, at Chicago, Illinois, on February 18, 2014.

10

11

12        _/s/ Colleen M. Conway, CSR,RMR,CRR_        _03/05/14_

13              Official Court Reporter              Date
             United States District Court
14           Northern District of Illinois
                  Eastern Division
15

16

17

18

19

20

21

22

23

24

25